UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

CASE NO.:

ISIDORA PEJOVIC, CHAE BEAN KANG,
ALBA SALA HUERTA, and CHASSIDY KING,                    1:17-cv-1092 (TJM/DJS)
individually and on behalf of all those similarly
situated, and GORDON GRAHAM,

       Plaintiffs,

vs.

STATE UNIVERSITY OF NEW YORK AT
ALBANY, and MARK BENSON,

       Defendants.
_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

This is an action based on long-standing and ongoing violations of Title IX of the Education Amendments of 1972 by the State University of New York at Albany ("SUNY Albany"), and on age discrimination by SUNY Albany, and by its Director of Athletics individually. In March 2016, Defendant SUNY Albany eliminated its women's tennis team just as the players were preparing to compete in the America East Conference Championships. Although entirely consistent with the manner in which Defendant SUNY Albany has discriminated against female athletes in the past, the decision to disband the team nevertheless came as a surprise to the student-athletes and their coach. Shortly after eliminating the women's program, SUNY Albany fired the team's head coach because its Athletic Director thought he was "old enough to retire."

The decision to end women's tennis at SUNY Albany left the players – all but one of whom were foreign students – in limbo.  For the foreign players, the option was to withdraw from Defendant SUNY Albany, give-up their visas, and return to their countries of origin, only to restart the process of applying to universities with the hope of gaining admission, obtaining scholarships, winning a spot on another tennis team, and securing a new visa, all before the next season began.  The women could have stayed at SUNY Albany and kept their scholarships.  But these women are athletes, who trained from an early age to play tennis, who were recruited by SUNY Albany to play tennis, and who came to Defendant's campus to play tennis.  The choice to stay and forego their dream – a choice that their male counterparts would never be required to make – was not a real choice or a viable option for these Plaintiffs.

Because Defendant SUNY Albany persists in its misconduct, this action is brought by the female tennis players in their individual capacities as well as on behalf of all similarly situated student-athletes, as well as by their former Head Coach, Plaintiff Gordon Graham, to redress the undisputed historic and ongoing discriminatory conduct perpetrated by Defendant SUNY Albany.  For his part, Plaintiff Gordon Graham also sues on the ground that Defendants have discriminated against him on the basis of his age in violation of federal and New York State law.

## STATEMENT OF THE CASE

1.      Defendant SUNY Albany holds itself out as a university committed to providing top-quality intercollegiate sports programs.  The university uses this distinction as part of its efforts to recruit top student athletes and coaching staff.  Under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and the regulations adopted pursuant to 34 C.F.R. Part 106 (collectively "Title IX"), Defendant SUNY Albany must

provide equality of opportunity for women and men in every program it offers, including equal opportunities for male and female athletes in intercollegiate sports programs.

2.      Defendant SUNY Albany discriminates against women on the basis of their sex by, among other things, intentionally providing substantially fewer and poorer opportunities for women in sports than for male students; by willfully failing to improve women's intercollegiate sports opportunities or add teams; and by willfully or purposefully neglecting even to consider or determine which sports opportunities women want and in which they could participate.  This is not a case where SUNY Albany tried to comply with the law and merely missed the mark; it willfully ignored the law.

3.      Defendant SUNY Albany compounded its historic Title IX wrongs in March 2016, by terminating the nine-member women's varsity tennis team and with it all opportunities for women to play intercollegiate tennis at SUNY Albany.  It piled on to these violations by later terminating the team's coach on the basis of his age.

4.      Following a complaint filed by Plaintiff Graham, the women's former tennis coach, the U.S. Department of Education's Office of Civil Rights ("OCR") investigated SUNY Albany's intercollegiate athletics programs.  OCR's recently published findings describe Defendant SUNY Albany's Title IX violations ("Official Findings"), including the termination of the women's tennis program.  These findings resulted in a toothless negotiated agreement between the Department of Education and SUNY Albany ("Resolution Agreement").  *See* Exhibit A.

5.      The Resolution Agreement only requires that Defendant SUNY Albany stop violating Title IX no later than the 2020-2021 academic year.  The Resolution Agreement provides for no sanctions against Defendant SUNY Albany for its present misconduct.

Neither does the Resolution Agreement provide any relief for the irreparable harms being done in the meantime to Plaintiffs or to the Plaintiff Class by the historic and continuing unlawful acts of Defendant SUNY Albany.  Sadly, the Resolution Agreement does not contain a sanctions provision if Defendant SUNY Albany fails to comply with Title IX on or before the 2020-2021 academic year. Plaintiffs accordingly bring this private cause of action for specific relief for themselves and to secure relief for the Plaintiff Class.

6.      Defendant SUNY Albany intentionally concealed its decision to terminate the women's tennis program in order to deprive Plaintiffs of any effective opportunity to contest the decision. This secret decision also denied Plaintiffs any opportunity to plan for, protect themselves against, or mitigate the sudden and devastating impacts on their personal and academic lives and sports careers.

7.      Defendant SUNY Albany's termination of the women's varsity tennis program also violated a prior Stipulation and Order of the Albany County Supreme Court signed by the Honorable Justice Lawrence Kahn, now a Senior Judge of this Court, to which SUNY Albany was a party ("Prior Order"). *See* Exhibit B.

8.      Plaintiff Graham was also denied his right to freedom from discrimination in his employment based upon his age by Defendant SUNY Albany and by Defendant Mark Benson, individually.  Defendant's employee and agent, Mark Benson, demoted, humiliated, and then fired Graham after terminating the tennis program because, as Benson stated publicly, the 65-year old coach was "old enough to retire."

9.      Undersigned counsel was first retained by some of the Plaintiffs in April 2017, on a *pro bono* basis.  Counsel promptly contacted SUNY's Chancellor, Nancy Zimpher, and then SUNY Albany, to request reconsideration of its unlawful termination of women's tennis.

The Administration of SUNY Albany, including its Acting President, advised counsel that it would "stand by" its decision to eliminate the team.

10.     Plaintiffs seek to stop Defendants from discriminating against them and all others similarly situated. They seek injunctive relief to reinstate the women's tennis program and supervise an accelerated Title IX compliance program, monetary damages for compensation of injury caused by Defendants' discrimination on the basis of sex and age, attorneys' fees and costs, and such other relief as may be available from this Court.

## JURISDICTION AND VENUE

11.     This action arises under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.,* and the regulations and policies promulgated pursuant to that law, as well as under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, as enforced through 42 U.S.C. §§ 1983 and 1988. This Court has jurisdiction over Plaintiffs' federal law claims pursuant to 28 U.S.C. §§ 1331, 1343(3), and 1343(4).

12.     This action also arises under Title 15 of the Executive Law of the State of New York ("Human Rights Law").  This Court has supplemental jurisdiction to enforce New York's Human Rights Law and the Prior Order of the New York Supreme Court, pursuant to 28 U.S.C. Section 1367.

13.     Declaratory and other relief is authorized pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 2202 to obtain the correct interpretation of the legal requirements described in this Complaint, which are necessary and appropriate to determine the respective rights and duties of the parties to this action.

14.     Venue is proper in the United States District Court for the Northern District of New York pursuant to 28 U.S.C. § 1391(b) because the events from which Plaintiff's claims arise occurred in Albany, New York, which is within the jurisdiction of this Court.

## THE PARTIES

### *The Women Plaintiffs*

15.     Every spot on the women's tennis team represents a lifetime of dreams and the sacrifice that it took to make those dreams a reality, including overcoming life-changing personal, family, economic, and physical challenges both on and off the tennis court. It should be noted that the women Plaintiffs here are not in this alone. While not parties to this lawsuit, their families have done their best to encourage their daughters' dreams and support them through their struggles, and suffer as only parents can, when those dreams are shattered.

16.     The women's tennis team at Defendant SUNY Albany consisted of a dedicated 65-year old coach and a group of student-athletes who had developed themselves into community and academic leaders.

17.     Plaintiff Isidora Pejovic is a rising junior at Defendant SUNY Albany. She joined the women's team her freshman year in 2014 and played until Defendant SUNY Albany wrongfully terminated the team. Isidora played tennis in her native Serbia beginning at the age of five. At thirteen, she began studying English to pursue her goal of coming to the United States – the only country where a young woman like her could play competitive tennis while obtaining a world-class education. Eventually, Isidora became one of the top players in her country. She passed her Collegiate Scholastic Aptitude Tests in English and successfully navigated the difficult process of obtaining a scarce student visa. Her visa restricted her to

attending only one school - Defendant SUNY Albany. She was recruited by SUNY Albany, and chose it because of the competitive opportunities, great coaching, and the full scholarship it offered. After struggling scholastically and athletically in her first semester, Isidora emerged as a star player for the SUNY Albany Great Danes in the Spring of 2015, and went on to win many matches over the following year, including the clinching match in the America East Championship Tournament in May 2016.

18.     After Defendant SUNY Albany disbanded the team, Plaintiff Pejovic received interest from other schools but did not have the resources or ability to transfer. To do so, she would have had to apply for and obtain admission to another institution with room for her on its women's tennis program, obtain a scholarship offer, withdraw from Defendant SUNY Albany, return to Serbia, forfeit her student visa, and re-apply for a new visa to attend a specific new school. Even if she could get a new visa, which was far from a forgone conclusion in her mind, there could be no assurance that the tennis team at the new college would still have scholarships or even room for her by the time she could arrive on campus. Moreover, under the rules of the National Collegiate Athletic Association ("NCAA"), a student athlete in an NCAA Division I program such as Defendant SUNY Albany is only allowed a single transfer to a Division I school. These risks, which were generally applicable to all of the women Plaintiffs, are hereafter referred to as the "Transfer Risks." Plaintiff Pejovic resides in Albany, New York, which is within this Court's jurisdiction.

19.     Plaintiff Chae Bean Kang is a rising senior at Defendant SUNY Albany. Plaintiff Kang joined the women's tennis team in her freshman year in 2014 and continued to play until the team was wrongfully terminated. Plaintiff Graham recognized "Bean" as a gifted

athlete who only needed match experience to become a truly competitive NCAA Division I tennis player. A native of South Korea, her family moved often to provide her with opportunities to refine and develop her talent and learn English. A highly sought-after recruit, Bean was persuaded to come to Defendant SUNY Albany. Once there, she established an excellent academic record and was expected to break into the regular tennis team lineup as a junior. Because Plaintiff Kang had fallen in love with the university and established a place for herself in the community over her first two years, the shocking betrayal of her dreams and goals with only two years of eligibility remaining, in addition to the Transfer Risks, left her with no practical choice to pursue her tennis career. Plaintiff Kang resides in Albany, New York, which is within this Court's jurisdiction.

20.     Plaintiff Alba Sala Huerta was a junior at Defendant SUNY Albany and a member of its women's tennis team when Defendants suddenly and without warning ended its existence. Plaintiff Graham described Alba Sala as one of the most intelligent tennis players he had seen in thirty-five years of coaching champions in the sport. She was a two-time All-America East player and a three-time Intercollegiate Tennis Association All-Academic award winner. She was a fan favorite and had the chance, if she had been able to play in her senior year, to become one of SUNY Albany's all-time greatest players in terms of total matches won. Alba came to Albany from her native Spain for the same reasons as her teammates – she was a champion player and top student who wanted to study at a university where she could play competitive tennis while obtaining a world-class education. At age sixteen, Alba engaged an agency to help her secure a scholarship. Both Iowa State University and Bryant University offered her scholarships, but like her teammates, Alba ultimately chose Defendant

SUNY Albany.  She began her studies and joined the tennis team in the fall semester of 2013 and graduated in May of 2017.

21.     The summer after Defendant SUNY Albany terminated women's tennis, the University of Massachusetts invited Alba to join its team.  As with her teammates, however, the Transfer Risks posed too great an obstacle and would have resulted in further harm through the loss of course credits and the requirement that she complete an additional semester at her own cost and expense.   Because she lost her senior year of eligibility, Plaintiff Sala Huerta was also denied an extra year of graduate eligibility and missed the possibility of additional employment, potentially with a full scholarship, as a graduate tennis assistant coach at Defendant SUNY Albany or elsewhere. Plaintiff Sala Huerta resides in Albany, New York, which is within this Court's jurisdiction.

22.     Plaintiff Chassidy King was a junior at Defendant SUNY Albany and a member of the women's tennis team from 2013 until Defendant suddenly and without warning ended the team's existence.  Chassidy was the most athletically gifted player that Plaintiff Graham had coached in thirty-five years.  The only U.S. Citizen on the team, she grew up in Antigua and lacked only match experience when she came to SUNY Albany on a tennis scholarship as a freshman.  Through her passionate effort and skill, she had just earned a spot on the team's lineup, when Defendant SUNY Albany terminated the women's tennis team. In addition to tennis, Plaintiff King served as a role model for many youngsters in the Albany area, working with children in the 15-LOVE program, a local community initiative that helps inner-city children through after-school education enrichment and tennis.  She was also enrolled in the university's intensive nursing preparation program and so could not withdraw to play tennis at

another school. Plaintiff King resides in Philadelphia, Pennsylvania, but submits to the Court's jurisdiction for purposes of this lawsuit.

### *The Women's Tennis Team's Coach*

23.    Plaintiff Gordon Graham is the former Head Coach of Defendant SUNY Albany's women's tennis team. He originally came to SUNY Albany to rebuild the women's tennis program.  Plaintiff Graham was in his fifth year as Head Coach at the time that Defendant unlawfully terminated the team.  Shortly after the university's decision, Graham led his now disbanded team to victory at the America East Conference Championship.  He has a singularly distinguished resume of coaching championship women's tennis teams at the University of the Pacific and Harvard University, where his teams won nine Ivy League Championships. He has been Pacific Coast Athletic Association Coach of the Year, Intercollegiate Tennis Association Coach of the Year for the East Region, and ITCA Coach of the Year for the Northwest Region. Coach Graham founded The Tennis Camps at Harvard, which served 1200 campers each summer.  He also founded a community-based tennis program in greater Boston that serves over 500 juniors and adults. Plaintiff Graham resides in Albany, New York, which is within this Court's jurisdiction.

### *Defendant SUNY Albany*

24.    Defendant SUNY Albany is a principal campus of the State University of New York ("SUNY"), which is an Educational Corporation formed and existing under the Education Law of the State of New York.  SUNY Albany's campus and principal place of business is located at 1400 Washington Avenue, Albany, New York, which is within this Court's jurisdiction.

25.     Although not individually named as defendants in this action, Defendant SUNY Albany was aided and abetted in its discriminatory conduct by a group of high-ranking university officers and employees whose identities and roles in this lawsuit are outlined below:

- Nancy L. Zimpher was, at all relevant times, the Chancellor of SUNY and was an agent and employee of SUNY with authority over and responsibility for the administration of Defendant SUNY Albany;

- Robert J. Jones became the President of Defendant SUNY Albany in January 2013. In July 2016, after only three and one half years in that job and following the termination of the women's tennis program, he left.  With respect to his responsibilities as President, Jones was an agent and employee of SUNY Albany with authority and responsibility for the administration of SUNY Albany including its athletics programs and was, at all relevant times, under the direct supervision and control of Chancellor Nancy L. Zimpher;

- Professor James R. Stellar acted as the Interim President of SUNY Albany from September 2016 until September 2017. In his position and with respect to his responsibilities as Interim President, Professor Stellar was an agent and employee of SUNY Albany with authority and responsibility for the administration of SUNY Albany including its athletics programs and, was at all relevant times, under the direct supervision and control of Nancy L. Zimpher; and

- Chantelle Cleary is the Assistant Vice President for Equity and Compliance at SUNY Albany and holds the title of Title IX Coordinator. Upon information and belief,

Defendant Cleary is an attorney licensed to practice in the State of New York.  In her position and with respect to her responsibilities, Cleary reported to and was under the supervision and control of President Jones and/or Interim President Stellar at all relevant times.

### *Defendant Mark Benson*

26.     Defendant Mark Benson is and has been the Director of Athletics of SUNY Albany, since 2014. Defendant Benson is an employee and agent of Defendant SUNY Albany who reported directly to and was under the direct supervision and control of Robert J. Jones or James R. Stellar at all times relevant to this Complaint.

### ALLEGATIONS AS TO THE PLAINTIFF CLASS

27.     The named women Plaintiffs (Pejovic, Kang, Sala Huerta, and King) bring this action on behalf of themselves and on behalf of a class of all those similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2).

28.     The women Plaintiffs seek to represent a class of all present, prospective, and future female students at SUNY Albany who want to participate in the recently eliminated varsity sport of women's tennis or who want to participate in other varsity sports not offered to women by SUNY Albany. They also seek to represent those female student athletes who are deterred from enrolling at SUNY Albany because it does not offer women the sport they wish to play.

29.     Each of the named women Plaintiffs is a member of the proposed class and has been or will be injured by Defendant SUNY Albany's sex discrimination and failure to provide female students with an opportunity to participate in varsity intercollegiate athletics at SUNY

Albany. Defendant SUNY Albany's continued elimination of the women's varsity tennis program will exacerbate the discrimination and denial of opportunity by eliminating female athletic participation opportunities at SUNY Albany.

30.     The women Plaintiffs seek to represent the proposed class because joinder of all class members and all persons harmed by Defendant SUNY Albany's failure to provide opportunity to participate in varsity intercollegiate athletics would be impossible.

31.     The proposed class is known to exist but the identity of its members is and will continue to change without specific names during this litigation because of the nature of college enrollment and athletic participation. Students at SUNY Albany generally aim to graduate four years after they matriculate.  Athletes are eligible for only four years, according to the rules of the National Collegiate Athletic Association (NCAA). Accordingly, the members of the class harmed by Defendant SUNY Albany's discriminatory actions constantly change as each class of students graduate and as another class of students enrolls at SUNY Albany.

32.     Not all members of the plaintiff class are currently identifiable because the class includes prospective and future students who will enroll at SUNY Albany during this litigation or who will be deterred from enrolling at SUNY Albany because of Defendant SUNY Albany's failure to provide athletic participation opportunities for female student-athletes, including the sports they want to play.

33.     Not all members of the plaintiff class are currently identifiable because the class includes not only tennis players, but also all present, prospective, and future female students who want to participate in other varsity intercollegiate sports that are not offered at Defendant SUNY Albany.

34.     Upon information and belief, Defendant SUNY Albany has never surveyed its present or prospective student body to assess athletic interests and abilities. Moreover, because SUNY Albany recruits high school students and transfer students from around the world, SUNY Albany could increase and thus realize athletic participation opportunities for female students by starting virtually any new women's varsity sports team and then recruiting women to enroll and participate.

35.     It is unknown how many present, prospective, or future female student-athletes would enroll at Defendant SUNY Albany or would participate in athletics at the university if it stopped discriminating against women.  The hundreds of additional student-athletes who might apply, who might be recruited, and who might participate in athletics at Defendant SUNY Albany if, for example, it added the approximately ninety-seven athletic opportunities necessary to reach proportional equality of opportunity for women participating in intercollegiate sports at Defendant SUNY Albany, are too numerous to make joinder practicable.

36.     The women Plaintiffs satisfy the "commonality" requirement of Federal Rule of Civil Procedure 23(a)(2) because they share questions of law and fact in common with the proposed class, particularly whether Defendant SUNY Albany is violating Title IX by failing to provide female student-athletes with an opportunity to participate in varsity intercollegiate athletics. Because Title IX requires comparison of the sex-segregated men's and women's athletic opportunities as a whole, the Title IX issues in this action are inherently class-based.

37.     The women Plaintiffs satisfy the "typicality" requirement of Federal Rule of Civil Procedure 23(a)(3) because their claims are typical of those of the proposed class. They all have been denied, are continuing to be denied, or will be denied an opportunity to participate

in varsity intercollegiate athletics at Defendant SUNY Albany because of its ongoing sex discrimination. All of them want the Court to restrain Defendant SUNY Albany from continuing its elimination of any women's varsity sports opportunities and to require it to restore and reinstate tennis and add more women's varsity sports.

38.     The women Plaintiffs are members of the proposed class because each: (a) is or was a female student-athlete at SUNY Albany, (b) is or was a former member of its women's tennis team, (c) was or is currently being subjected to Defendant SUNY Albany's sex-based-discrimination, and (d) was or currently is being denied athletic participation opportunities provided to male student athletes at Defendant SUNY Albany, and they will fairly and adequately represent the interests of the class. They intend to prosecute this action vigorously in order to secure fair and adequate injunctive relief for the entire class.

39.     The women Plaintiffs satisfy the requirement that class certification would be superior to other methods available for the fair and efficient adjudication of the controversy required by Federal Rule of Civil Procedure 23(b)(2) because Defendant SUNY Albany has acted or refused to act on grounds generally applicable to the class - denying female student-athletes an opportunity to participate in varsity intercollegiate athletics, including but not limited to, women's varsity tennis, thereby making final declaratory and injunctive relief appropriate with respect to the class as a whole.

40.     Undersigned counsel has devoted substantial and sufficient efforts to identify and investigate potential claims in this action, to developing knowledge of the applicable law, and has sufficient resources to commit to representing this putative class as interim counsel

under Federal Rule of Civil Procedure 23(g)(3) until such time as this Court determines whether to certify the action as a class action.

## GENERAL ALLEGATIONS

### Financial Pressures Lay the Groundwork for Eliminating Women's Tennis

41.     Defendant SUNY Albany promotes its athletic programs in order to recruit top athletes.  Its website lauds the significant dollars invested by the university on its athletic facilities: "The University at Albany's $19 million multi-sport complex was completed in September 2013. The state-of-the-art 8,500-seat facility includes a distinct press level with four luxury suites, print media area, and booths for radio, television, coaches, and replay, as well as 20 high-definition televisions distributed throughout the level."[1]

42.     Defendant SUNY Albany's athletics department has been under financial pressure in recent years. Exacerbating that pressure, in January 2013, while the expensive new sports complex was still being built, the New York Football Giants announced that after sixteen years, they would no longer conduct summer drills at the campus because it lacked an *indoor* football field in which to practice on rainy days.

43.     In 2014, Defendant SUNY Albany hired Mark Benson as its Athletics Director. Benson had never been employed as an athletic director at any school, at any level, let alone at an NCAA Division I program.  Defendant SUNY Albany hired Benson because of his purported ability to raise money from private contributors and pack stadiums with paying fans.

---

1.      [1]www.ualbanysports.com/ViewArticle.dbml!?&DB_OEM_ID=15800&ATCLID=209273988 (last visited September 12, 2017)

44.     For his part, Benson acknowledged the financial pressures facing the Athletics Department but assured the coaches of all of the intercollegiate teams that he "was not here to cut teams."

45.     Benson's efforts failed to regularly pack the football stadium at Defendant SUNY Albany which, upon information and belief, has an 8,500-seat capacity which can be expanded to 24,000 seats.   Upon further information and belief, Benson has only filled the 8,500 seats three times since he joined Defendant SUNY Albany in 2014.[2]

46.     Upon information and belief, the annual operating budget for SUNY Albany is more than five hundred forty million dollars.[3]

### *The Department of Education Cites Defendant SUNY Albany*

47.     A Policy Interpretation issued by OCR in 1979 and codified at 44 Fed. Reg. at 71418 (the "OCR Policy Interpretation"), sets forth three areas of compliance under Title IX: (1) equal athletic financial assistance; (2) equal treatment and benefits for athletic teams; and (3) effective accommodation of student interests and abilities.   This lawsuit is about effective accommodation only.   The OCR Policy Interpretation provides three ways -- commonly referred to as prongs one, two, and three -- for a university to comply with the requirement to provide effective accommodation of students' interests and abilities:

> "(1)     Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

---

[2] https://en.wikipedia.org/wiki/Bob_Ford_Field (last visited September 23, 2017)
[3] https://en.wikipedia.org/wiki/State_University_of_New_York (last visited September 12, 2017).

(2)   Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3)   Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program." *Id.*

48.   The National Association of College and University Attorneys ("NACUA") publishes and updates authoritative legal guidance on, among other matters, the practice of Title IX compliance.  Upon knowledge and belief this guidance is widely available to attorneys with responsibilities as legal counsel in universities, such as Defendant SUNY Albany, its President James Stellar, its Athletic Director Mark Benson, and its Assistant Vice President and Title IX Coordinator Chantelle Cleary.

49.   The edition of "NACUA Notes" published as of January 22, 2010, is representative of the widely-published guidance that NACUA promulgates to universities across the nation on the important topic of Title IX, stating under the topic "The Title IX Implications of Eliminating an Intercollegiate Sports Team", that

If an institution chooses to eliminate an intercollegiate team from the underrepresented sex, then it must do so in a manner that ensures substantial proportionality.

…

If an institution eliminates a team and does not replace it with a team that provides greater participation opportunities, then it is legally impossible to comply with part two ("History & Continuing Practice of Program Expansion") of the three-part test. As explained above, part two requires an institution to demonstrate a history and continuing practice of program expansion for the underrepresented sex. Yet, if a college or university is eliminating a team for the

underrepresented sex, it is necessarily reducing, not expanding opportunities.

Similarly, if an institution eliminates a team [of the underrepresented sex], it is legally impossible to comply with part three ("Fully Accommodating Interests & Abilities") of the three-part test. As detailed previously, part three of the three-part test requires an institution to demonstrate that its current selection of sports fully and effectively accommodates the interests of the underrepresented sex. However, regardless of whether one uses the narrow definition of the Bush Administration or the broader definition of the Obama Administration, an institution that has eliminated a team cannot prove full and effective accommodation. Quite simply, the fact that the institution recently fielded an intercollegiate team demonstrates that there is interest and ability in the sport as well as an expectation of reasonable competition. The institution really has no viable claim otherwise. NACUANOTES, June 22, 2010 Vol. 8 No. 10 at 4,5.

50.     As the following excerpts from its Official Findings attest, OCR has determined SUNY Albany to be in violation of Title IX in all three prongs of the test for compliance, and has found that the termination of the women's tennis team is itself a violation of title IX.

1.  "OCR determined that in academic year 2015-2016 [the school year in which Women's Tennis was terminated]…in order to achieve exact proportionality with male opportunities and overall enrollment, female athletic opportunities would [have needed] to be increased by approximately 55 for a total of 310. OCR determined that… the University does not satisfy Part One [of the Three Part Test of compliance] for academic year 2015-2016." Official Findings, p.5.

2.  "OCR determined that in academic year 2016-2017…female athletic opportunities would [have needed] to be increased by approximately 97 for a total of 345. OCR determined that… the University does not satisfy Part One for academic year 2016-2017." Id.

3.  "The University last added a women's sport to its athletic program during 1995-1997, even though the number of female athletes continues to be disproportionate to enrollment. Additionally, OCR determined that the University eliminated

women's tennis effective at the conclusion of the 2015-2016 season.  Based on this information, OCR determined that the University has not demonstrated a record of adding intercollegiate teams, or upgrading teams to intercollegiate status, for the underrepresented sex." <u>Official Findings</u>, p.6. (footnote omitted)

4.  "OCR determined that during academic year 2015-2016, the University discontinued the women's tennis team, despite demonstrated interest and ability of the University students. ***** Based on the foregoing, OCR determined that University has not demonstrated a history of program expansion, and there is no policy or procedure for requesting the addition of sports. Therefore, OCR cannot determine that the University has established compliance under Part Two of the Three-Part Test." <u>Official Findings</u>, p.8.

5.  "OCR determined that the University has not surveyed the student body to assess students' interests and abilities. ***** The Athletic Director stated that he believes the current program effectively accommodates female students' interests and abilities; however, as stated above, OCR determined that during academic years 2015-2016, the University discontinued the women's tennis team, despite demonstrated interest and ability of University students.

Accordingly, OCR determined that the University has not established

compliance under Part Three of the Three-Part Test." *Id.,* p.10.

6.  "Based on the above, OCR determined that …the University did not demonstrate that it provides each sex with equitable athletic opportunities under any part of the Three-Part Test.  Therefore, OCR determined that the University failed to establish that it has effectively accommodated the athletic interests and abilities of women, the underrepresented sex, as required by the regulation implementing Title IX, at 34 C.F.R. Section 106.41(c)(1)." *Ibid.*, p.11.

51.    These official findings understate Defendant SUNY Albany's repeated and

successful efforts to sidestep the requirements of Title IX.  For years, Defendant SUNY

Albany's reports to the Department of Education have employed a variety of methods to short-

change female student-athletes, including double-counting both men and women participating in so-called "Indoor Track and Field and Outdoor Track and Field" and counting males who practice with women's teams *as women*.

### The Secret Decision to Terminate Women's Tennis

52.     In the fall of 2015, Defendant Mark Benson met with Plaintiff Graham to discuss, among other things, the women's tennis team's eligibility for the NCAA championships.  The women's team competed in the America East athletic conference, which had less than six teams at the time.  Defendant Benson noted that under the NCAA's rules, the winner of the conference championship would not be automatically eligible for the NCAA championships. As a consequence, Defendant Benson explained that he and his staff were looking for an alternative conference that would provide the women's tennis team an automatic berth. Neither Defendant Benson, nor any of his staff, ever indicated that Defendant SUNY Albany planned to eliminate women's tennis.

53.     At no time after this meeting did Defendant Benson solicit any ideas from Plaintiff Graham as to how to structure a competitive schedule that would allow the team to compete for an at-large invitation for post-season play, nor did he request help from Plaintiff Graham as the highly experienced and nationally-recognized head coach of women's tennis, in finding an alternative conference for the women's tennis team.

54.     Upon information and belief, Defendant Benson did not conduct a search for an alternative conference during the 2015-2016 academic year.

55.     Upon further information and belief, Defendant Benson rejected at least one NCAA athletic conference's offer to accept the women's tennis team.

56.     Defendant Benson kept secret from and refused to inform or advise Plaintiffs of any deliberations, opportunities, or considerations concerning women's tennis throughout 2015-2016, notwithstanding inquiries by Plaintiff Graham.

57.     For his part, Plaintiff Graham planned a competitive schedule for 2016-2017 and beyond.  Graham believed this schedule would help the SUNY Albany team climb the national rankings and become a post-season "at-large" team, potentially qualifying for the NCAA Championships. Defendant Benson never asked for those plans, nor met with Plaintiff Graham during the 2015-2016 academic year.

58.     Upon information and belief, Defendant Benson had already decided, with the knowledge and consent of then-President Robert Jones and Vice-President Chantelle Cleary, to terminate the women's tennis team and redistribute its $365,000 operating budget for other uses. This strategy would spare Defendant Benson from having to raise private donations or reduce the budgets from other programs including men's teams in order to account for any financial shortfall.

59.     Chantelle Cleary, with the knowledge and consent of then-President Jones and Defendant Benson, and notwithstanding her knowledge of Defendant SUNY Albany's non-compliance and her responsibilities to the student-athletes as Vice-President of Equity and Compliance and Defendant SUNY Albany's designated Title IX Officer, expressly supported the unlawful decision to terminate the women's tennis team.

### Defendant SUNY Albany Ends Women's Tennis

60.     On the evening of March 23, 2016, in a surprise announcement, Defendant Benson told Plaintiff Graham that Defendant SUNY Albany would terminate women's tennis

immediately following the team's participation in the America East Conference Championships. Defendant Benson then warned Plaintiff Graham, who had personally recruited many of the players that would be impacted by the university's decision, not to tell anyone about SUNY Albany's machinations. Defendant Benson said that he wanted to ensure that word of the decision would not leak to the team, the players' families, or the public before his planned press release.

61.     Plaintiff Graham nevertheless told the players about the termination after practice the next morning. The players trusted Graham. He had recruited them from around the world and Plaintiff Graham knew they would be devastated. After breaking the news to his team, Plaintiff Graham and his assistant coaches took the players to meet with Defendant Benson. After that meeting a furious Benson screamed at and threatened Graham.

62.     Defendant Benson later materially altered a statement from Plaintiff Graham without the latter's permission and published it in Defendant SUNY Albany's official press release. The unauthorized modification made it seem as if Plaintiff Graham agreed with and supported the decision to terminate the women's tennis team.

### *Coach Graham is Terminated Because of His Age*

63.     In the five years prior to the elimination of women's tennis, Plaintiff Graham successfully recruited and built a champion women's tennis team of nine players from the United States and five other countries. Eight of the players were on full scholarships. Following the announcement regarding the termination of the women's tennis team, Plaintiff Graham was given only meaningless administrative tasks and no professional coaching opportunities. Defendant Benson's Deputy, Jerry Koloskie, told Coach Graham that if he did not like the

assignments he was given, "they could always force you to do a 9 to 5 boring job taking attendance in the "Bubble.""[4]

64.     Defendant Benson made discriminatory and deprecating comments to athletics department staff and to an alumna of Defendant SUNY Albany about Coach Graham's age and readiness for retirement, telling some of them that Graham was "old enough to retire." Ultimately, Plaintiff Graham was stripped of all duties and was expressly told by Defendant Benson's Deputy, Koloskie, that he should focus only on counseling his former team members "…as they transition from being student athletes to being merely students."

65.     Plaintiff Graham's early retirement in May of 2016 would have saved the athletic department at Defendant SUNY Albany the equivalent of his salary for 15 months.  Having failed to persuade him to retire with demotions and humiliation, in July 2016 Defendant SUNY Albany notified Plaintiff Graham that despite five years of excellent annual reviews and championship results, his contract would not be renewed after it expired on August 14, 2017.

66.     In November 2016, Plaintiff Graham filed a complaint with the OCR under Title IX.  By letter of January 11, 2017, the OCR notified Graham that it was opening an investigation into his complaint. In the meantime, Plaintiff Graham continued to search for counsel who would help the team on a *pro bono* basis.

---

[4] The "Bubble" refers to a large inflatable facility at the SUNY Albany campus that is used for intramural sports and practices.

**COUNT I**

**Title IX**

**(By the Women Plaintiffs and Plaintiff Class Against Defendant SUNY Albany)**

67.     Plaintiffs re-allege and incorporate by reference all of the foregoing allegations.

68.     Plaintiffs are entitled to injunctive relief that restrains Defendant from continuing to discriminate on the basis of sex, restrains Defendant from refusing to support the women's tennis program, and requires Defendant to reinstate the women's tennis program that was unlawfully terminated, until such time, if ever, as Defendant can terminate the team without violating Title IX.

69.     Plaintiff Classes are further entitled to injunctive relief requiring Defendant SUNY Albany to come into strict compliance with Title IX on an accelerated basis, irrespective of the leisurely pace and toothless performance requirements for compliance contained in Defendant SUNY Albany's Resolution Agreement with the Department of Education.

70.     The OCR has found and Plaintiffs allege Defendant SUNY Albany to be in persistent, continuing, and comprehensive violation of Title IX, but neither OCR's procedures nor the voluntary Resolution Agreement specifies any remedy for individual harms or requires SUNY Albany to reinstate any particular sport or otherwise make Plaintiffs whole.

71.     OCR found and Plaintiffs allege that separate and apart from the historical and ongoing violation of Title IX by Defendant SUNY Albany, the act of terminating the varsity intercollegiate women's tennis program violated Title IX.

72.     OCR has advised Plaintiff's counsel that because of its narrow mandate, OCR has no objection and is indifferent to the outcome of this private action.

73.     Defendant SUNY Albany's actions deny the Plaintiffs their legal right to participate in varsity college sports on an equal basis with men at SUNY Albany. Athletics provides non-academic but crucial training in discipline, health, work ethic, social behavior, camaraderie, and, of course, lifelong networking.  SUNY Albany deprived the Plaintiffs of all of these invaluable opportunities and benefits when it eliminated the women's tennis program.

74.     If injunctive relief is not granted during the pendency of this action, Plaintiffs Pejovic and Kang will suffer irreparable harm by permitting Defendant SUNY Albany to continue to discriminate against them, and by denying them both an opportunity to participate in varsity intercollegiate athletics. If Defendant SUNY Albany is not required by this Court to reinstate women's varsity tennis, these individual Plaintiffs will never again have the opportunity to participate in this valuable educational experience - one that provides academic, physical, psychological, social, and even economic benefits for the rest of the participants' lives. There is no adequate remedy at law for these harms.

75.     Upon information and belief, Defendant SUNY Albany could compensate for the immaterial fraction of its more than $540,000,000 budget that a nine-person women's tennis team represents, merely by rounding the roster caps for a few of its seven men's teams.[5] This would be an even lighter burden for the next year, as there are only two of the women's tennis team's players who remain enrolled at the University. Upon information and belief, Defendant would gain public relations and enrollment advantages from doing so, which could be economically advantageous in attracting more students by demonstrating to student-athletes

_____

[5] Defendant SUNY Albany reports eight men's teams to the U.S. Department of Education, counting both "Indoor track" and "Outdoor track" as separate teams, but the evidence adduced at trial will show that with few exceptions the same individuals populate the rosters of both "teams."

prompt action and commitment to comply with Title IX by offering more opportunities for its female students.  The first two championship-level tennis players are currently on campus, the former Head Coach of women's tennis is still present in the community, the coach handles all the organizational, scheduling, logistical, and training for the program, his contract is still warm, and the program's cost is insignificant.  If Defendants were not merely retaliating against the Plaintiffs, reinstating women's tennis would be the easiest of baby steps toward both Title IX compliance and mitigation of ongoing harm.

76.    The injunctive relief that Plaintiffs request on behalf of themselves and the Plaintiff Class will promote the public interest in that it will increase educational opportunities for female students and will promote compliance with federal law. Congress decided that sex-based discrimination in collegiate athletics was not in the public interest when it enacted Title IX and reaffirmed that public interest over the past thirty-seven years by defeating each and every attempt that has been made to weaken Title IX.  Equal opportunity for all students - male and female - is at the core of this case, is at the core of American identity, and is clearly in the public interest.

77.    Notwithstanding the irreparable harms which have been done and continue to be imposed on the women Plaintiffs, they have suffered injury which may compensated for, in part, by awards of money damages, including among other things lost professional status and reputation, lost opportunities for employment and professional acclaim, costs of seeking opportunities at other schools, lost past and future employment, lost compensation and benefits, humiliation, emotional pain and distress, lost self-esteem, and other injuries.

## COUNT II

## Title IX

**(By Plaintiff Gordon Graham as Coach of the Women's Tennis Program Against Defendant SUNY Albany)**

78.     Plaintiff Gordon Graham re-alleges and incorporates by reference all the foregoing allegations.

79.     The OCR has found and Plaintiff Graham alleges that Defendant SUNY Albany is in persistent, continuing, and comprehensive violation of Title IX, but neither OCR's procedures nor the voluntary Resolution Agreement specifies any remedy for individual harms or requires SUNY Albany to reinstate any particular sport or Coach or otherwise make Plaintiff Graham whole.

80.     OCR found and Plaintiff Graham alleges that separate and apart from the historical and ongoing violation of Title IX by Defendant SUNY Albany, the act of terminating the varsity intercollegiate women's tennis program violated Title IX.

81.     The unlawful termination of the varsity intercollegiate women's tennis team by Defendant SUNY Albany intentionally and wrongfully discriminated against Plaintiff Graham on the basis of the sex of the women student-athletes he coached, causing him irreparable harm and injury.

82.     Because of Defendant SUNY Albany's unlawful termination of the women's tennis team he recruited, mentored, and coached, and the particular vulnerabilities of its victims in this case as foreign students with a 65-year old coach, which vulnerability was exploited by SUNY Albany in the method and timing of its termination of the team, Plaintiff Graham was forced to contest the University's actions alone.  Because he did so, including filing an official complaint with the OCR, he may now be branded as a "whistleblower," with little prospect of

future coaching employment in his chosen profession, and every prospect of retribution by Defendant SUNY Albany.

83.    Notwithstanding the irreparable harms which have been done and continue to be imposed on Plaintiff Graham, he has suffered injury which may compensated for in part by an award of money damages, including among other things lost professional status and reputation, lost opportunities for employment and professional acclaim, lost past and future employment, lost income and benefits, lost compensation and benefits, humiliation, emotional pain and distress, lost self-esteem and other injuries.

**COUNT III**
**42 U.S.C Sections 1983 and 1988**
**(By Plaintiff Graham Against Defendant Benson)**

84.    Plaintiff Gordon Graham re-alleges and incorporates by reference all of the foregoing allegations.

85.    The Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States as codified at 42 U.S.C Sections 1983 and 1988, prohibits discrimination against any person on the basis of age.

86.    On or about March 23, 2016, Benson advised Plaintiff Graham for the first time that the women's tennis team was to be terminated.  Thereafter, Defendant Benson personally took and ordered repeated acts of age discrimination against Plaintiff Graham in violation of 42 U.S.C. 1983.

87.    When, on March 23, 2016, Defendant Benson first announced to Plaintiff Graham that the tennis team would be terminated, Defendant Benson asked the then-65-year-

old coach Graham how old he was.  Defendant Benson also said in front of others at that meeting that Plaintiff Graham was "close to retirement."

88.     On the morning that the university publicly announced its decision to end women's tennis, Defendant Benson screamed at and threatened Coach Graham in front of others, telling him "While we will honor your contract, how well you handle this situation in the next couple of months will determine how well things go for you for the next fifteen months."

89.     Shortly thereafter, Defendant Benson stripped Plaintiff Graham of all meaningful responsibilities and humiliated him by, among other things, assigning him meaningless tasks and denying him coaching opportunities with any other of Defendant's teams.

90.     Later, Defendant Benson's deputy and Plaintiff Graham's immediate supervisor advised Graham that he should focus on doing nothing but helping the members of the now disbanded women's tennis team "…as they transition from being student athletes to being merely students."

91.     When Plaintiff Graham complained, Defendant Benson's deputy only humiliated Graham further by warning that this decorated tennis coach could spend his days taking attendance at the campus's "inflatable" practice facility, saying "If you don't like it, they could always force you to do a 9 to 5 boring job taking attendance in the Bubble."

92.     In a meeting with a dedicated UA tennis alumna who had come to question the decision to terminate the team, Defendant Benson told her that Coach Graham could "retire if he wants to," since he was "old enough."

93.     In another meeting with his senior staff, Defendant Benson described the

situation regarding the termination of the women's tennis program and told those in attendance that "Gordon is old enough that he could retire now."

94.    In July of 2016, Defendant SUNY Albany notified Plaintiff Graham that upon the determination of Defendant Benson and despite five years of excellent annual reviews and championship results, Graham's contract would not be renewed after it expired on August 14, 2017.

## COUNT IV
## NEW YORK STATE HUMAN RIGHTS LAW
### (By Plaintiff Graham Against Defendant SUNY Albany)

95.    Plaintiff Gordon Graham re-alleges and reincorporates by reference all of the foregoing allegations.

96.    Defendant SUNY Albany is an Educational Corporation formed and existing under the Education Law of the State of New York.

97.    Section 296 (3.a) of Title 15 of New York State's Executive Law ("Human Rights Law") prohibits discrimination in the terms, conditions or privileges of employment by an employer on the basis of age against any person 18 years of age or older.

98.    Section 296 (3.d) of the Human Rights Law prohibits termination or retirement from employment by an employer on the basis of age.

99.    Defendant SUNY Albany is a covered employer under the Human Rights Law.

100.    In 2014, Defendant SUNY Albany hired Defendant Mark Benson as an employee with the title of Director of Athletics. In that position, Benson had supervisory authority over all of the intercollegiate athletics programs and employees including Plaintiff Graham as a subordinate employee and Head Coach of the women's intercollegiate tennis team.

Jerry Koloskie was Benson's Deputy Athletics Director, Plaintiff Graham's immediate supervisor, and an employee and agent of Defendant SUNY Albany.

101.    After disbanding the women's tennis team, Benson, Koloskie and other agents and employees of Defendant SUNY Albany, engaged in repeated acts of age discrimination in violation of New York State's Human Rights Law.

102.    Defendant SUNY Albany, acting through Benson and Koloskie, stripped Plaintiff Graham of all meaningful job functions, leaving him only to perform meaningless and humiliating administrative tasks.

103.    Benson, while employed in his official capacity by Defendant SUNY Albany and in his performance of those duties, made several derogatory remarks regarding Plaintiff Graham's age to members of Defendant SUNY Albany's athletics department staff and at least one alumna.

104.    On March 23, 2016, when Athletics Director Benson first announced to Plaintiff Graham that the tennis team was to be terminated, Benson expressly asked the then-65-year-old coach how old he was. Director Benson also said in front of others at that meeting that Plaintiff Graham was "close to retirement."

105.    During a formal meeting with a dedicated UA tennis alumna who had come to question the decision to terminate the team, Director Benson told her that Coach Graham could "retire if he wants to", since he was "old enough."

106.    In another meeting with the senior staff of the Athletics Department of SUNY Albany, who reported to him in his official capacity, Director Benson described the situation regarding the termination of the women's tennis program and told those in attendance

that "Gordon is old enough that he could retire now."

107.    In July of 2016, Defendant SUNY Albany notified Plaintiff Graham that notwithstanding five years of excellent annual performance reviews and championship results, Graham's contract would not be renewed after it expired on August 14, 2017.

108.    Upon information and belief, SUNY Albany has involuntarily terminated the contracts of no other Head Coaches of its intercollegiate athletics programs, for any reason, for more than five years prior to its termination of Plaintiff Graham.

## COUNT V
## DECLARATORY RELIEF
### (By All Plaintiffs Against Defendant SUNY Albany)

109.     Plaintiffs re-allege and incorporate by reference all of the foregoing allegations.

110.     SUNY Albany at all times pertinent to this Complaint remained subject to the Stipulation and Order of the New York State Supreme Court, Albany County dated August 26, 1994 in Case No. 4934-94, in the matter of James *Kane, David Lichten, Michael Wexler, Paul Garnock, Amy Hilton, Kenneth Barclay, Mark Ynagthara and Eric Rose, Petitioners, vs. State University of New York at Albany, Patrick Swygert, President, State University at Albany, Dr. Milton Richards, Gail Cummings-Danson, Dennis Elkin, John Morgan and Richard Hall, Respondents* ("Prior Order").  *See* Exhibit A. The Prior Order states in pertinent part:

"The Respondent State University of New York at Albany *shall mitigate the impact of any future decision to terminate programs or reduce them to less-than-varsity status*, by:

a. *Giving prompt notice of the decision to all potentially affected parties*, including, but not limited, to coaches, current athletes, the student body generally, the University Undergraduate Admissions Office, and other colleges and universities contacting [the Athletics Department] regarding transfer

admissions for athletes, and

b. *All changes in program shall be in compliance with federal law* and made in accordance with appropriate University procedures.

c. In the event any such programs are to be terminated, *respondents shall provide appropriate notice of such termination so as to give any participant or recruit the opportunity to transfer to another athletic program at another college or university without loss of opportunity in successive years." Prior Order*, at p. 2 (*emphasis supplied).*

111.    The actions of Defendant SUNY Albany and its officers, employees, and agents alleged in this Complaint constitute breaches of the Prior Order in each and every one of its three material elements set forth above, which breaches, if committed with knowledge of the Prior Order, would be grounds for sanctions.

112.    A present and actual controversy exists between Plaintiffs and Defendant SUNY Albany.  Plaintiffs allege, among other things, that their rights have been intentionally violated by Defendant SUNY Albany in breach of the Prior Order.  Other potentially affected parties including but not limited to the Plaintiff Class remain at risk to Defendant SUNY Albany's actions.  Declaratory relief is necessary and appropriate in the public interest to awaken Defendants and other potentially affected parties to the rights of students at the University at Albany under the Prior Order.

## ATTORNEYS' FEES AND COSTS

113.    Plaintiffs have been required to retain attorneys to prosecute all claims in this action.  Recovery of the costs of such prosecution, including reasonable attorney's fees and fees of experts, may be allowed to the prevailing party by the Court in its discretion pursuant to 42 U.S.C. § 1988 (b) and (c).

114.   Plaintiffs claim entitlement to recovery of their costs, including but not limited to reasonable attorneys' fees and expert fees, should Plaintiffs prevail in their action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(1)   Certify the proposed class of plaintiffs;

(2)   Issue preliminary and permanent injunctions requiring Defendant SUNY Albany to stop discriminating against women in the operation of its intercollegiate athletics programs and to come into full and complete compliance with Title IX in the operation of its intercollegiate athletics programs within one year;

(3)   Issue preliminary and permanent injunctions requiring Defendant SUNY Albany to immediately reinstate its economic, logistical, coaching, and staffing support of the women's tennis program equivalent to the levels present at the time of the  March 24, 2016 termination of that program, and further not to eliminate or reduce the status of women's tennis or any women's varsity athletic team or opportunity until such time as the Court shall find that Defendant SUNY Albany is in full and complete compliance with Title IX and that such elimination or reduction in the status of a women's team would not violate Title IX.

(4)   Enter an Order declaring that Defendant SUNY Albany violated the terms of the Prior Order of the Supreme Court of the State of New York, Albany County by failing to give notice of the termination of the varsity women's tennis program to all potentially affected parties including without limitation Plaintiff Graham, by terminating the varsity women's tennis program in violation of Federal law under Title IX, and by failing to give appropriate notice of such termination to the women Plaintiffs.

(5)     Award monetary damages to the individual women Plaintiffs and Plaintiff Graham by way of partial compensation for substantial injury associated with, among other things, lost professional status and reputation, lost opportunities for employment and professional acclaim, costs of seeking opportunities at other schools, lost past and future employment, lost compensation and benefits, humiliation, emotional pain and distress, lost self-esteem and other injuries set forth in this Complaint, in an amount to be determined at trial.

(6)     Plaintiff Graham also prays this Court to issue an injunction to require Defendants to reinstate him as Head Coach of the women's varsity tennis team at SUNY Albany, in a non-hostile environment, without retaliation, under his previously applicable contractual arrangements with the same salary, benefits, and resources he enjoyed prior to Defendants' unlawful termination of the team in March 2016;

(7)     Maintain jurisdiction over this action and assign a Special Master to monitor Defendant SUNY Albany's full and timely compliance with the Court's orders;

(8)     Award Plaintiffs including the Plaintiffs' Class their reasonable attorneys' fees, costs, expenses, and interest pursuant to 42 U.S.C. § 1988; and

(9)     Grant Plaintiffs including Plaintiffs' Class such other and further relief as may be just and proper under the circumstances, including punitive damages, in amounts to be determined at trial, to be distributed or applied as a jury shall determine.

///

///

///

///

///

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial as to all claims so triable.

Dated:  September 29, 2017

Respectfully submitted,

**Rimon, P.C.**

*/s/ Bernays T. Barclay*_____
Bernays T. Barclay (Bar Roll No.520808)
Rimon, P.C.
255 Patroon Creek Boulevard #4467
Albany, NY 12206
Telephone: (516) 375-2524
buz.barclay@rimonlaw.com
**Attorneys for Plaintiffs**

# EXHIBIT A

EXHIBIT A



**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE FOR CIVIL RIGHTS
32 OLD SLIP, 26TH FLOOR
NEW YORK, NEW YORK 10005

TIMOTHY C. J. BLANCHARD
DIRECTOR
NEW YORK OFFICE

August 9, 2017

Gordon Graham
10 Elmwood Street
Albany, New York 12203

Re:     Case No. 02-17-2037
        State University of New York at Albany

Dear Mr. Graham:

This letter is to notify you of the determination made by the U.S. Department of Education, Office for Civil Rights (OCR), with respect to the above-referenced complaint you filed against the State University of New York, University at Albany (the University). You alleged that the University discriminates against female students, on the basis of sex, by failing to fully and effectively accommodate the interests and abilities of female students to the extent necessary to provide equal athletic opportunities to members of both sexes. Hereinafter, you will be referred to as "the complainant."

OCR is responsible for enforcing Title IX of the Education Amendments of 1972 (Title IX), as amended, 20 U.S.C. § 1681 et seq., and its implementing regulation at 34 C.F.R. Part 106, which prohibit discrimination on the basis of sex in programs and activities receiving financial assistance from the U.S. Department of Education (the Department). The University is a recipient of financial assistance from the Department. Therefore, OCR has jurisdictional authority to investigate this complaint under Title IX.

The regulation implementing Title IX, at 34 C.F.R. § 106.41(a), specifically prohibits discrimination on the basis of sex in athletic programs offered by recipients of financial assistance from the Department. The regulation implementing Title IX, at 34 C.F.R. §106.41(c), states that a recipient that operates or sponsors athletic teams must provide equal opportunity for members of both sexes.

**Applicable Legal Standards**

The regulation implementing Title IX, at 34 C.F.R. § 106.41(a), specifically prohibits discrimination on the basis of sex in athletic programs offered by recipients of financial assistance from the Department. The regulation implementing Title IX, at 34 C.F.R. §106.41(c),

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

states that a recipient that operates or sponsors athletic teams must provide equal opportunity for members of both sexes.

### *Accommodation of Interests and Abilities*

The regulation implementing Title IX, at 34 C.F.R. § 106.41(c)(1), states that in determining whether equal opportunities are available, OCR will consider, among other factors, whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes. OCR's Three-Part Test assesses athletic opportunities.[1] The Three-Part Test furnishes three individual avenues for measuring compliance with the requirement to provide individuals of each sex with nondiscriminatory opportunities to participate in intercollegiate athletics. Each part of the Three-Part Test is an equally sufficient and separate method of complying with the Title IX regulatory requirement to provide nondiscriminatory athletic participation opportunities.

OCR applies the Three-Part Test as follows to assess whether an institution is providing equal participation opportunities for individuals of both sexes:

  i.    Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

  ii.   Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion that is demonstrably responsive to the developing interests and abilities of that sex; or

  iii.  Where the members of one sex are underrepresented among intercollegiate athletes and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

If an institution meets any one part of the Three-Part Test, OCR will determine that the institution has provided each sex with equitable opportunities to participate. If an institution's athletic program also equitably provides each sex with the level of competition reflective of their respective abilities, OCR will determine that the institution has effectively accommodated athletic interests and abilities.[2]

---

[1] For further information, see the OCR Intercollegiate Athletics Policy Interpretation, issued December 11, 1979; 44 Fed. Reg. 71413 (1979) **(1979 Policy Interpretation)**; a letter from OCR, dated January 16, 1996, entitled "Clarification of Intercollegiate Athletic Policy Guidance: the Three-Part Test" **(1996 Clarification)**; a letter from OCR, dated July 11, 2003, entitled "Further Clarification of Intercollegiate Athletics Policy" **(2003 Clarification)**; and a Dear Colleague Letter, issued on April 20, 2010, regarding the three-part test **(April 2010 DCL)**.
[2] For further information, see 1996 Clarification; 2003 Clarification.

In addition to determining whether men and women are afforded equitable opportunities to participate, OCR also will assess the following factors to determine whether the quality of competition provided to male and female athletes equally reflects their abilities:

i.   Whether the competitive schedules for men's and women's teams, on a program-wide basis, afford proportionately similar numbers of male and female athletes equivalently advanced competitive opportunities.

ii.  Whether the University can demonstrate a history and continuing practice of upgrading the competitive opportunities available to the historically disadvantaged sex as warranted by developing abilities among the athletes of that sex.

If an institution meets any one part of the Three-Part test, and can also demonstrate that it provides an equitable level of competition to athletes of each sex, OCR will determine that the institution has effectively accommodated the athletic interests and abilities of the underrepresented sex.[3]

## Findings of Fact

OCR collected and analyzed data for academic years 2014-2015, 2015-2016 and 2016-2017; conducted interviews of the complainant, third parties, and the Athletic Director; and made compliance determinations with respect to the accommodation of athletic interests and abilities.

### A. Background

The State University of New York, University at Albany (the University) is a public university located in Albany, New York. The University is a member of the National Collegiate Athletic Association (NCAA) and the University's athletic teams compete in NCAA Division I and Division I Football Championship Subdivision.

### B. Effective Accommodation of Athletic Interests And Abilities

OCR examined whether the University provides male and female students an equal opportunity to participate in its intercollegiate athletics program by effectively accommodating their interests and abilities, in accordance with 34 C.F.R. § 106.41(c)(1). There are two aspects to OCR's analysis of this program component. ●CR first considered the opportunities provided to students of each sex to compete in intercollegiate events, and then compared the quality of competition provided to women's teams with the quality of competition provided to men's teams.

> 1. Part One: Are Competitive Opportunities Substantially Proportionate to Enrollment?

Under Part One of the Three-Part test, where an institution provides intercollegiate level participation opportunities for male and female students in numbers substantially proportionate to their respective full-time undergraduate enrollments, OCR will find that the institution is

---

[3] For further information, see 1996 Clarification; 2003 Clarification.

providing nondiscriminatory participation opportunities for individuals of both sexes. OCR will also consider opportunities to be substantially proportionate when the number of opportunities that would be required to achieve proportionality would not be sufficient to sustain a viable team; i.e., a team for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team. As a frame of reference in assessing this situation, OCR may consider the average size of teams offered for the underrepresented sex, a number that might vary by institution.[4]

To establish whether competitive opportunities were substantially proportionate to enrollment, OCR examined participation opportunities for academic years 2014-2015, 2015-2016 and 2016-2017. In determining participation opportunities, OCR counted the number of actual athletes participating[5] in each competitive sport.[6]  To establish the number of intercollegiate athletic participation opportunities, OCR examined the squad lists prepared by University for the NCAA; and compared these to the participation numbers per team calculated by the University and provided to OCR; as well as to the participations numbers reported on the EADA.

### Academic Year 2014-2015

In academic year 2014-2015, there were 6,228 (51.49%) males and 5,867 (48.51%) females enrolled at the University as full-time undergraduate students; 12,095 in total. The University provided 346 (or 57.00% of the total) athletic opportunities for male students, and 261 (or 43.00% of the total) athletic opportunities for female students; for a total of 607 athletic opportunities.

Based on this information, OCR determined that in academic year 2014-2015, males had more opportunities to participate than did females. Females had 261 (43.00%) of the athletic opportunities while they represented 5,867 (48.51%) of the overall enrollment. The difference between female enrollment and opportunities is 5.51%. In order to achieve exact proportionality with male opportunities and overall enrollment, female athletic opportunities would need to be increased by approximately 65 for a total of 326. OCR determined that the University had an average female team size of 25 for academic year 2014-2015. The underrepresentation of 65 athletes is more than the average team size of 25; thus, the University does not satisfy Part One for academic year 2014-2015.

### Academic Year 2015-2016

In academic year 2015-2016, there were 6,591 (51.09%) males and 6,311 (48.91%) females enrolled at the University as full-time undergraduates; for a total of 12,902. The University provided 324 (or 55.96% of the total) athletic opportunities for male students, and 255 (or

---

[4] For further information, see 1996 Clarification.

[5] As a general rule, OCR counts all student athletes listed on a team's squad or eligibility list, and who are on the team as of the team's first competitive event. Under the interests and abilities analysis, a student athlete who participates in more than one sport will be counted separately as a participant in each sport.

[6] An extracurricular activity not involving competition as its purpose is not considered a competitive sport for purposes of the interests and abilities analysis.

44.04% of the total) athletic opportunities for female students; for a total of 579 athletic opportunities.

Based on this information, OCR determined that in academic year 2015-2016, females had 255 (44.04%) of the athletic opportunities while they represented 6,311 (48.91%) of the overall enrollment. The difference between female enrollment and opportunities is 4.87%. In order to achieve exact proportionality with male opportunities and overall enrollment, female athletic opportunities would need to be increased by approximately 55 for a total of 310.  OCR determined that the University had an average female team size of 25 for academic year 2015-2016. The underrepresentation of 55 athletes is more than the average team size of 25; thus, the University does not satisfy Part One for academic year 2015-2016.

*Academic Year 2016-2017*

In academic year 2016-2017, there were 6,154 (49.49%) males and 6,280 (50.51%) females enrolled at the University as full-time undergraduates; for a total of 12,434.  The University provided 338 (or 57.68% of the total) athletic opportunities for male students, and 248 (or 42.32% of the total) athletic opportunities for female students; for a total of 586 athletic opportunities.

Based on this information, OCR determined that in academic year 2016-2017, females had 248 (42.32%) of the athletic opportunities while they represented 6,280 (50.51%) of the overall enrollment. The difference between female enrollment and opportunities is 8.19%. In order to achieve exact proportionality with male opportunities and overall enrollment, female athletic opportunities would need to be increased by approximately 97 for a total of 345.  OCR determined that the University had an average female team size of 25 for academic year 2016-2017. The underrepresentation of 97 athletes is more than the average team size of 25; thus, the University does not satisfy Part One for academic year 2016-2017.

> 2.  Part Two:  Is there a History and Continuing Practice of Program Expansion for the Underrepresented Sex?

Under Part Two of the Three-Part test, an institution may demonstrate compliance by showing that it has a history and continuing practice of program expansion that is demonstrably responsive to the developing interests and abilities of the underrepresented sex.  Part Two examines an institution's past and continuing remedial efforts to provide nondiscriminatory participation opportunities through program expansion.

OCR considers the following factors, among others, as evidence indicating an institution's history of program expansion that is demonstrably responsive to the developing interests and abilities of the underrepresented sex:

- A record of adding intercollegiate teams, or upgrading teams to intercollegiate status, for the underrepresented sex;
- A record of increasing the numbers of participants in intercollegiate athletics who are members of the underrepresented sex; and

- An affirmative response to requests by students or others for addition or elevation of sports.

OCR will also consider the following factors, among others, as evidence that may indicate a continuing practice of program expansion that is demonstrably responsive to the developing interests and abilities of the underrepresented sex:

- The current implementation of a nondiscriminatory policy or procedure for requesting the addition of sports (including the elevation of club or intramural teams) and the effective communication of the policy or procedure to students; and
- The current implementation of a plan of program expansion that is responsive to developing interests and abilities.

*A record of adding intercollegiate teams, or upgrading teams to intercollegiate status, for the underrepresented sex.*

The University's intercollegiate athletics program dates to the 1890s, but the University reported that its development was hampered due to inadequate facilities, lack of financial support and the relatively few numbers of male students enrolled at the institution at the time. The University stated that the men's tennis program began in 1898 and men's basketball in 1909; however, the University's attempts to field teams in football (1922), baseball (1896-1901), swimming and hockey were eventually aborted.

The University stated the following regarding the development of its athletics program and the approximate inception dates of the sports constituting the men's and women's athletic programs:

- 1960s – men's lacrosse, track and field, cross country and swimming upgraded from club to varsity status; introduction of women's tennis, softball, field hockey, basketball and swimming.
- 1973 – football upgraded from club to varsity status.
- 1995-1997 – women's field hockey and women's golf added as varsity sports; wrestling, men and women's swimming, men's tennis and JV basketball were discontinued.[7]

The University last added a women's sport to its athletics program during 1995-1997,[8] even though the number of female athletes continues to be disproportionate to enrollment. Additionally, OCR determined that the University eliminated women's tennis effective at the conclusion of the 2015-2016 season. Based on this information, OCR determined that the University has not demonstrated a record of adding intercollegiate teams, or upgrading teams to intercollegiate status, for the underrepresented sex.

---

[7] The University reported that these sports were discontinued to achieve equity in participation rates.
[8] The University was unable to provide a more specific date.

*A record of increasing the numbers of participants in intercollegiate athletics who are members of the underrepresented sex.*

The University provided to OCR a copy of its 2001 NCAA Equity, Welfare and Sportsmanship Self Study; its 2010-2011 NCAA Division I Athletics Certification Self Study Instrument (2010-2011 Self Study) and its NCAA Sports Sponsorship and Demographics Form for 2016-2017. The 2010-2011 Self Study noted that women were underrepresented in athletic participation opportunities and set forth the goal of full and effective accommodation for the underrepresented sex for the period 2010-2011 through 2014-2015.

The University indicated that one step it has taken in furtherance of its goal is roster management. Specifically, it has capped the rosters of men's baseball and men's track and field. The Athletic Director stated that this has resulted in closing the participation gap for women; however, OCR's analysis indicated that while male participation opportunities have decreased over the three year period, so have female participation opportunities. The Athletic Director also stated that the University uses walk-on tryouts for all teams to increase participation numbers. The University indicated that teams have a lot of walk on players as a result, but was unable to articulate specifically whether this action has increased participation opportunities for the underrepresented sex.

*An affirmative response to requests by students or others for addition or elevation of sports.*

The University stated that it has not received any written or oral requests to expand the men's and/or women's intercollegiate athletic programs in the past five (5) years.

*The current implementation of a nondiscriminatory policy or procedure for requesting the addition of sports (including the elevation of club or intramural teams) and the effective communication of the policy or procedure to students*

The University stated that it does not have a specific policy with regard to the addition of sports, but that it would follow the NCAA rules and regulations for creating Division I sports programs.

*The current implementation of a plan of program expansion that is responsive to developing interests and abilities.*

The University stated that it does not have a current plan to expand its athletics program.

OCR determined that during academic year 2015-2016, the University discontinued the women's tennis team, despite demonstrated interest and ability of University students. The University stated that in summer and fall 2015, three member schools of the America East Conference announced that they were discontinuing women's tennis on their respective campuses, leaving only three member schools (the University, SUNY Binghamton, and SUNY Stony Brook) in the American East Conference. With only three members, the America East Conference no longer met the NCAA's six team minimum for automatic qualification for the national tournament; therefore, the conference discontinued its sponsorship of women's tennis. The University stated

that it unsuccessfully attempted to identify options that would allow it to continue sponsoring women's tennis and afford the team the opportunity to participate in the NCAA national tournament. The Athletic Director explained that Division I is very competitive and the reason a university will support a Division I team is to participate in post season competition. He stated that if you take away the opportunity to compete in post season competition, it is not consistent with why you sponsor Division I programs. The University also examined the possibility of allowing the tennis team to continue independently, but stated that to do so would create too much uncertainty in terms of which teams the University would play and when they would play; and also would not afford the opportunity to participate in post-season competition. The Athletic Director explained that without the automatic post-season qualifier, recruitment would suffer, causing athletic excellence to suffer.

Based on the foregoing, OCR determined that University has not demonstrated a history of program expansion, and there is no policy or procedure for requesting the addition of sports. Therefore, OCR cannot determine that the University has established compliance under Part Two of the Three-Part Test.

3. Part Three: Is the Institution Fully and Effectively Accommodating the Interests and Abilities of the Underrepresented Sex?

Under Part Three of the Three-Part test, OCR determines whether an institution is fully and effectively accommodating the interests and abilities of the underrepresented sex. Although disproportionately high athletic participation rates by one sex (as compared to their enrollment rates) may indicate that an institution is not providing equal athletic opportunities to its students of the other, underrepresented sex, an institution can satisfy Part Three where there is evidence that the imbalance does not reflect discrimination; i.e., where it can be demonstrated that notwithstanding disproportionately low participation rates of the underrepresented sex, the interests and abilities of these students are, in fact, being fully and effectively accommodated.

In making this determination, OCR considers whether there is (1) unmet interest in a particular sport; (2) sufficient ability to sustain a team in the sport; and (3) a reasonable expectation of competition for the team.

Because women are substantially underrepresented in the University's competitive sports relative to their percentage of the student population, OCR investigated whether there was unmet interest in a women's sport that was not offered by the University. OCR evaluates a broad range of indicators in determining whether an institution has unmet interest and ability to support an intercollegiate team in a particular sport, including the following five elements: (1) whether an institution uses nondiscriminatory methods of assessment when determining the athletic interests and abilities of its students; (2) whether a viable team for the underrepresented sex recently was eliminated; (3) multiple indicators of interest; (4) multiple indicators of ability; and (5) frequency of conducting assessments.

An institution may determine the athletic interests and abilities of its students using methods of its own choosing provided that:

- The processes take into account the nationally increasing levels of women's interests and abilities;
- The methods of determining interest and ability do not disadvantage the members of an underrepresented sex;
- The methods of determining ability take into account team performance records; and
- The methods are responsive to the expressed interests of students capable of intercollegiate competition who are members of an underrepresented sex.

An institution should document its assessment of students' interests and abilities. OCR evaluates the interests of the underrepresented sex by examining multiple indicators, including:

- Requests by students and admitted students that a particular sport be added;
- Requests for the elevation of an existing club sport to intercollegiate status;
- Participation in club or intramural sports;
- Interviews with students, admitted students, coaches, administrators and others regarding interests in particular sports;
- Results of surveys or questionnaires of students and admitted students regarding interest in particular sports;
- Participation in interscholastic sports by admitted students; and
- Participation rates in sports in high schools, amateur athletic associations, and community sports leagues that operate in areas from which the institution draws its students.

An institution may not rely on a survey alone, regardless of response rate, to determine whether it is fully and effectively accommodating the interests and abilities of its underrepresented students.

OCR must examine multiple indicators when determining whether there is sufficient ability among interested students of the underrepresented sex to sustain a team, including:

- The athletic experiences and accomplishments – in interscholastic, club or intramural competition – of underrepresented students and admitted students interested in playing the sport;
- Opinions of coaches, administrators, and athletes at an institution regarding whether interested students and admitted students have the potential to sustain an intercollegiate team;
- If the team has previously competed at the club or intramural level, whether the competitive experience of the team indicates that it has the potential to sustain an intercollegiate team;
- Participation in other sports, intercollegiate, interscholastic or otherwise, that may demonstrate skills or abilities that are fundamental to the particular sport being considered; and

- Tryouts or other direct observations of participation in the particular sport in which there is interest.

OCR's evaluation of whether an institution assesses interest and ability periodically so as to be able to identify any developing interests and abilities of the underrepresented sex in a timely and responsive manner takes several factors into account, including:

- The degree to which the previous assessment captured the interests and abilities of the institution's students and admitted students of the underrepresented sex;
- Changes in demographics or student population at the institution (e.g. virtually complete student body turnover every four years at a typical four-year institution); and
- Whether there have been complaints from the underrepresented sex with regard to a lack of athletic opportunities or requests for the addition of new teams.

OCR determined the University has not surveyed the student body to assess students' interests and abilities. The University's mandatory admissions application includes an "Activities" section requesting that the applicant report any activities that he/she participated in during high school, or college if a transfer applicant; and whether the individual intends to participate in a similar activity in college. The information is shared with the Athletics Department. The University did not indicate that it has taken any action responsive to information gleaned from the admissions data. The University also completes an in-depth exit interview with each student athlete leaving the athletics program, and analyzes information gleaned from such interviews to discover trends. The Athletic Director stated that he has not discovered any trends indicating that there are students interested in sports that are not currently offered by the University. The Athletic Director stated that he believes the current program effectively accommodates female students' interests and abilities; however, as stated above, OCR determined that during academic year 2015-2016, the University discontinued the women's tennis team, despite demonstrated interest and ability of University students.

Accordingly, OCR determined that the University has not established compliance under Part Three of the Three-Part Test.

*Equivalent Levels of Competition*

The University is a member of the NCAA; therefore, the University is subject to its policies, procedures, rules and regulations. The University is a member of the America East Conference in all sports except football, which is a member of the Colonial Athletic Conference; and women's golf, which is a member of the Metro Atlantic Athletic Conference.

The University competed at the NCAA Division I level in all sports, except football, which participated in Division I FCS. OCR determined that during academic year 2016-2017, women's basketball (one Division II opponent), baseball (one Division II opponent), men's basketball (one

Division II opponent) were the only teams to compete against institutions outside of the Division I level during the regular season.[9]

OCR did not find evidence to indicate that athletes did not receive genuine athletic participation opportunities or that the opportunities provided were not equivalent based on sex. Accordingly, OCR determined that the University overall provided equitable levels of competition for those students afforded athletic opportunities.

**Conclusion**

Based on the above, OCR determined that although the University provided equitable levels of competition, the University did not demonstrate that it provides each sex with equitable athletic opportunities under any part of the Three-Part Test. Therefore, OCR determined that the University failed to establish that it has effectively accommodated the athletic interests and abilities of women, the underrepresented sex, as required by the regulation implementing Title IX, at 34 C.F.R. § 106.41(c)(1).

On August 7, 2017, the University agreed to implement the enclosed resolution agreement, which addresses the compliance concerns noted above. OCR will monitor implementation of the Agreement. If the University fails to implement the Agreement, OCR may initiate administrative enforcement or judicial proceedings to enforce the specific terms and obligations of the Agreement. Before initiating administrative enforcement (34 C.F.R. §§ 100.9, 100.10), or judicial proceedings to enforce the Agreement, OCR shall give the University written notice of the alleged breach and 60 calendar days to cure the alleged breach.

This letter sets forth OCR's determination in an individual OCR case. This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public. The complainant may have the right to file a private suit in federal court whether or not OCR finds a violation.

Please be advised that the University may not harass, coerce, intimidate, or discriminate against any individual because he or she has filed a complaint or participated in the complaint resolution process. If this happens, the individual may file a complaint alleging such treatment.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. In the event that OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information that, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

---

[9] Women's basketball also played a pre-season scrimmage against a Division III institution in academic year 2016-2017.

Page 12 of 12 – Case No. 02-17-2037

Should you have any questions, please contact Jocelyn Panicali, Senior Compliance Team Attorney, at (646) 428-3796 or jocelyn.panicali@ed.gov; or Nadja Allen Gill, Compliance Team Leader, at (646) 428-3801 or nadja.r.allen.gill@ed.gov.

Sincerely,

Timothy C.J. Blanchard

Encl.

## RESOLUTION AGREEMENT

### The State University of New York
### University at Albany
### Case No. 02-17-2037

In order to resolve Case No. 02-17-2037, the State University of New York, University at Albany (the University) assures the U.S. Department of Education, Office for Civil Rights (OCR), that it will take the following actions pursuant to the requirements of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., and its implementing regulation at 34 C.F.R. Part 106 (Title IX).

The University agrees to provide participation opportunities in its intercollegiate athletics program for female and male students that equally and effectively accommodate the athletic interests and abilities of members of both sexes, consistent with the requirements of Title IX, at 34 C.F.R. § 106.41(c)(1). The University has advised OCR that it intends to demonstrate compliance by providing intercollegiate athletic participation opportunities for male and female students in numbers that are substantially proportionate to their respective enrollments. Accordingly, by no later than academic year 2020-2021, the University will demonstrate compliance by demonstrating that the participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments.

This Agreement does not constitute an admission on the part of the University that it violated any regulations enforced by OCR.

OCR has made clear to the University that OCR does not require or encourage the elimination of any University intercollegiate athletic teams and that it seeks action from the University that does not involve the elimination of athletic opportunities, because nothing in Title IX requires an institution to cut teams or reduce opportunities for students who are participating in intercollegiate athletics in order to comply with the provisions of Title IX relating to the effective accommodation of the interests and abilities of male and female students. OCR has also made clear to the University that Title IX provides institutions with flexibility and choice regarding how they will provide nondiscriminatory participation opportunities.

**Action Item I: Substantially Proportionate Participation Opportunities**

By October 1, 2020, if not compliant earlier, the University will demonstrate that the participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments. In doing so, the University will compare the enrollment rates of its female and male students with their rates of participation in the University's intercollegiate athletics program during the respective academic year to determine if these are substantially proportionate.

1. Enrollment rates will be calculated using the full-time undergraduate enrollment numbers, by sex.

Page 2 – Resolution Agreement Case No. 02-17-2037

2.  The participation rates of female and male students will reflect the total number of females and males listed on the NCAA varsity squad or eligibility list for each intercollegiate varsity sport on the date of the first competition for each sport.  The participation rates should not include participants in intramural, club or non-competitive athletic activities. Students who participate in more than one intercollegiate sport will be counted in each intercollegiate sport in which they participate.

**Reporting Requirement:** By October 1, 2017, 2018, 2019 and 2020, the University will provide, for OCR's review and approval, a detailed report, with copies of supporting documents, reflecting the University's evaluation of the proportions of female and male students in athletics conducted pursuant to Action Item I above.  The report will include, at a minimum, a copy of the enrollment and participation data that the University relied upon, and the NCAA squad or eligibility list for each intercollegiate sport on the date of the first competition for each sport.  The information provided by the University will be sufficient to allow OCR to determine the number of students, by sex, who were participating on each intercollegiate team on the date of the team's first competition and to identify any changes to the participation numbers that occurred after the first competition.  OCR will determine whether the University has demonstrated current compliance by demonstrating that the participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments.

In making the election to comply with Part One, the University is not waiving its right to demonstrate that it is otherwise in compliance with OCR's three-part test.  If the University determines that it wishes to demonstrate compliance by meeting Part Three, rather than Part One, the University will comply with the requirements set forth in Action Items II and III below, as appropriate.  In such a case, the University will notify OCR, and in consultation with OCR, revise the reporting requirement dates for Action Items II and III as necessary.

**Action Item II: Effective Accommodation of Interests and Abilities**

By October 1, 2020, if not compliant earlier, should the University elect to demonstrate that the interests and abilities of the members of the underrepresented sex (females) have been fully and effectively accommodated by the present program, then the University will conduct an objective assessment to determine the athletic interests and abilities of females, and whether the University is fully and effectively accommodating their athletic interests and abilities.  The assessment will be based on multiple indicators of interest and multiple indicators of ability, including:

1.  Results of recent surveys of students and admitted students or other information collected from students and admitted students using a method that is designed to fully and accurately assess unmet athletic interests and abilities in intercollegiate sports among members of the underrepresented sex. The survey shall seek information on female students' interest, and if applicable, ability to participate in sports not currently offered by the University but that are offered by other schools that compete within the University's athletic conferences and by schools that are within the University's normal competitive region.  The survey should include students' current and future interest in

Page 3 – Resolution Agreement Case No. 02-17-2037

athletics, plus an open-ended inquiry where students will be able to submit comments or requests for additional athletic opportunities at the University. Any survey used by the University to assess intercollegiate athletic interests and abilities will be pre-approved as to content and methodology by OCR; and, the methodology, implementation and response rates of each survey will maximize the possibility of obtaining accurate information and facilitating responses.

2. Identification of sports, squads, and levels of sports for members of the underrepresented sex that are not currently offered by the University that are offered by schools that compete within the athletic conferences in which the University competes and by schools that are within the University's normal competitive regions.

3. Review of any requests (whether oral or written, formal or informal) made to University administrators, coaches, or staff by or on behalf of students and admitted students who are members of the underrepresented sex to add a particular sport, squad, or level of sport, or to elevate an existing club or intramural sport to intercollegiate sport status. This review may be limited to requests that were received during the previous three complete academic years.

4. Assessments made by University coaches or staff during tryouts, or observations of students participating in club or intramural competition, and other information reflecting the ability of students and admitted students who are members of the underrepresented sex to compete in a particular sport, prior participation in that sport or a similar sport at the high school level or intramural or club level, general athletic ability, participation in other University intercollegiate sports, the nature of the particular sport, and other relevant factors. (Neither a poor competitive record, nor the inability of interested students or admitted students to play at the same level of competition engaged in by the University's other athletes is conclusive evidence of lack of ability. For the purposes of assessing ability, it is sufficient that interested students and admitted students have the potential to sustain an intercollegiate team.)

5. Participation in interscholastic sports by admitted students and participation rates in sports in high schools, amateur athletic associations, and community sports leagues that operate in areas from which the University draws its students.

6. Reviewing the number of female students cut from any team in the last four years, and the reasons they were cut, to assess whether any of the students who were cut have the ability to compete in that sport and whether sufficient numbers of students were cut to sustain another level in that sport.

7. Reviewing whether any viable women's team has been suspended or eliminated in the past 10 years and the reason for such decision.

8. Any other information that demonstrates the athletic interests and abilities of the University's students who are members of the underrepresented sex.

Page 4 – Resolution Agreement Case No. 02-17-2037

9. Where interest and ability in an intercollegiate sport not currently offered by the University is identified, the assessment will also consider whether there is a reasonable expectation of intercollegiate competition in the University's normal competitive regions in that sport.

**Reporting Requirements[1]:**

a) By June 30, 2018, the University will provide to OCR a copy of the draft survey referenced in Action Item II above, for OCR's review and approval.

b) By June 30, 2018, the University will provide to OCR a complete description of the planned methodology for conducting the survey, including how the survey will be distributed, the number of surveys to be distributed, any planned follow-up to the initial distribution of the survey, the names and contact information for the individual(s) who will evaluate the responses to the surveys, and the protocol for retaining a copy of any notes or other documents compiled during the review of the surveys.

c) Within 30 days of OCR's approval of the survey and plan for administering the survey, the University will administer the approved survey to its female students according to the plan approved by OCR.

d) By October 1, 2018, and by the same date in 2019 and 2020, if not compliant earlier, should the University elect to demonstrate that the interests and abilities of the members of the underrepresented sex (females) have been fully and effectively accommodated by the present program, the University will provide OCR with a detailed report about the assessment conducted pursuant to Action Item II of this Agreement. The report will include, at a minimum, the following information:

   i. Copies of any surveys administered under this section and the results of those surveys, including but not limited to a complete description of the methodology used to conduct the survey, including how the survey was distributed, the number of surveys distributed and the number of responses, any follow-up to the initial distribution of the survey, the names and contact information for the individual(s) who evaluated the responses to the surveys and a copy of any notes or other documents compiled during the review of the surveys;

   ii. A summary of sports and squads for members of the underrepresented sex that are not currently offered by the University that are offered by schools that compete within the athletic conferences in which the University competes and by schools that are within the University's normal competitive region;

---

[1] As stated above, these reporting dates may be revised, in consultation with OCR, should the University choose to demonstrate compliance by meeting Part Three, rather than Part One.

Page 5 – Resolution Agreement Case No. 02-17-2037

     iii.    Rates of participation by members of the underrepresented sex in club and intramural sports at the University;

     iv.    Rates of participation by members of the underrepresented sex in interscholastic sports that operate in the geographic areas from which the University draws its enrollment;

     v.    Copies of any written requests and summaries of any non-written requests made by or on behalf of students who are members of the underrepresented sex to add a particular sport or squad, or to elevate an existing club or intramural sport to intercollegiate sport status;

     vi.    Summaries of any assessments made during tryouts, or observations of students participating in club or intramural competition, and other information reflecting the ability of students who are members of the underrepresented sex to compete in a particular sport, prior participation in that sport or a similar sport at the high school level or intramural or club level, general athletic ability, participation in other University intercollegiate sports, the nature of the particular sport, and other relevant factors; and

     vii.    Any other information that was considered by the University as part of its assessment in determining whether it is fully and effectively accommodating the athletic interests and abilities of members of the underrepresented sex.

**Action Item III: Actions to Increase Athletic Opportunities**

By June 30, 2019, if the University is unable to demonstrate compliance pursuant to Action Items I or II of this Agreement, the University will submit to OCR for review and approval its detailed plan with timeframes to effectively accommodate the interests and abilities of the underrepresented sex to the extent necessary to provide equal opportunity in its intercollegiate athletics program by no later than academic year 2020-2021, including the steps noted below. In addition, the plan will include a description of interim steps that will be taken by the University during academic year 2019-2020 to increase intercollegiate athletic participation opportunities for women. The University also agrees to conduct periodic assessments of the athletic interests and abilities of its students in subsequent years to ensure that it is equally and effectively accommodating the athletic interests and abilities of its male and female students consistent with Title IX and its implementing regulation. The University will begin implementation of the plan approved by OCR within 30 days of OCR's approval.

1.  Sports currently offered

The University will institute a squad size policy providing for increased participation opportunities for students who are members of the underrepresented sex to the maximum extent feasible consistent with the nature of each sport and the level of interest in each sport while still ensuring that meaningful intercollegiate athletic participation opportunities are being provided for all team members. The policy will apply to each sport currently offered

Page 6 – Resolution Agreement Case No. 02-17-2037

and will not call for limiting or reducing intercollegiate athletic participation opportunities for the overrepresented sex.

2. Sports not currently offered

The University will determine whether there is a sufficient number of students and admitted students at the University who are members of the underrepresented sex with the interest and ability to support the addition of a team in sports not currently offered by the University as intercollegiate sports and sufficient competition in those sports within the University's normal competitive regions. If so, the University will add a team in those sports and will hire a coaching staff, recruit student athletes and provide sufficient resources to the coaching staff during academic year 2019-2020 to ensure that each team begins competition by academic year 2020-2021, consistent with the above determination.

3. Response to developing interests and abilities

For any sport that is not currently offered by the University in which there is a sufficient number of students and admitted students who are members of the underrepresented sex who have the interest and ability to support a team in that sport, but where the University determines that there is not sufficient competition in that sport within the University's normal competitive regions, the University will take ongoing steps to address such interest and ability. Steps may include establishment of intramural or club sports, exploring the establishment of competition in the University's normal competitive regions, and elevating such sports to intercollegiate status when competition becomes available.

4. Additional intercollegiate opportunities

To the extent that the University adds any sports, the University will provide those team(s), in a manner comparable to other intercollegiate teams, with sufficient funds in its budget to cover expenses, including but not limited to: coaches, recruiting, equipment and supplies, travel, publicity and support services.

**Reporting Requirements[2]:**

a) By June 30, 2019, the University will provide to OCR a report that includes information and supporting documentation demonstrating that its plan will effectively accommodate the interests and abilities of members of both sexes by academic year 2020-2021. The plan will include a description of interim steps that the University will take during academic year 2019-2020 to increase intercollegiate athletic participation opportunities for women.

b) By December 30, 2019, the University will provide to OCR status reports regarding its implementation of its plan to effectively accommodate the interests and abilities of

---

[2] As stated above, these reporting dates may be revised, in consultation with OCR, should the University choose to demonstrate compliance by meeting Part Three, rather than Part One.

members of both sexes including as applicable, information demonstrating that a coaching staff has been hired for any new teams being added by the University, an update on the University's progress in recruiting student athletes for the added teams, and a copy of the detailed budget provided to the teams to ensure that they are able to begin competition by academic year 2020-2021. The status reports will also include documentation regarding the interim steps the University has taken to increase intercollegiate athletic participation opportunities for women during academic year 2019-2020.

## Action Item IV: Process for Requesting Addition of New Sports or Levels of Sports

By November 30, 2017, the University will develop and adopt a process and written procedure for students or other interested parties, such as coaches or parents, to use in requesting the addition of new sports or levels of sports at the University. The process will be implemented upon approval by OCR, and notice and a copy of the procedure will be published with the electronic version of the Student Handbook (with changes to printed version to be made with the next published revision) and included in the Athletic Department's policies and procedures/manual, and the individual responsible for responding to any requests will be identified by name and contact information. This information will also be displayed on the University's website. The University shall retain all requests for new sports or levels of sports made through the procedure or otherwise in written or electronic form for a minimum of ten years.

### Reporting Requirements:

a) By September 30, 2017, the University will submit to OCR, for review and approval, a copy of its draft procedure for requesting new sports or levels of sports. OCR will respond within 30 calendar days.

b) By December 15, 2017, the University will provide documentation to OCR demonstrating that the procedure for requesting new sports or levels of sports has been adopted and disseminated to students and staff, including a link to the University's website where this information may be found.

c) By June 30, 2018, and June 30, 2019, the University will provide documentation to OCR demonstrating that the procedure for requesting new sports or levels of sports has been implemented during the past academic year, including copies of any requests and the responses to those requests.

The University understands that OCR will not close the monitoring of this Agreement until OCR determines that the University has fulfilled the terms of this Agreement and is in compliance with the regulation implementing Title IX, at 34 C.F.R. §§ 106.41(a) and (c)(1), which were at issue in this case. The University also understands that by signing this Agreement, it agrees to provide data and other information in a timely manner in accordance with the reporting requirements of this agreement. Further, the University understands that during the monitoring of this Agreement, OCR may visit the University, interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether the University has fulfilled the terms of this Agreement and is in compliance with the

Page 8 – Resolution Agreement Case No. 02-17-2037

regulation implementing Title IX, at 34 C.F.R. §§ 106.41(a) and (c)(1), which was at issue in this case. The University understands and acknowledges that OCR may initiate administrative enforcement or judicial proceedings, including to enforce the specific terms and obligations of this agreement. Before initiating administrative enforcement (34 C.F.R. §§ 100.9, 100.10), or judicial proceedings, including to enforce this Agreement, OCR shall give the University written notice of the alleged breach and sixty (60) calendar days to cure the alleged breach.

Date: 8/7/17

Kevin C. Wilcox
Associate Vice President, Finance and
Administration Controller
State University of New York, University at
Albany

# EXHIBIT B

EXHIBIT B

AUG-26-94 FRI 14:48    WEIN, YOUNG, et al        FAX NO. 5188685142          P. 02/04
AUG-26-1994 12:20 FROM  LITIGATION BUREAU         TO           9-8695142    P.02

STATE OF NEW YORK
SUPREME COURT    COUNTY OF ALBANY

In the Matter of the Application of
JAMES KANE, DAVID LICHTEN, MICHAEL
WEXLER, PAUL GARNOCK, AMY HILTON,
KENNETH BARCLAY, MARK YANAGIHARA and
ERIC ROSE,

                 Petitioners,

   - against -

STATE UNIVERSITY OF NEW YORK AT ALBANY,
PATRICK SWYGERT, PRESIDENT, STATE
UNIVERSITY OF NEW YORK AT ALBANY,
DR. MILTON RICHARDS, GAIL
CUMMINGS-DANSON, DENNIS ELKIN,
JOHN MORGAN and RICHARD HALL,

                 Petitioners,

STIPULATION AND
ORDER
Index No. 4834-94

WHEREAS, the respondent State University of New York at
Albany has reinstated the varsity wrestling, mens' tennis and
mens' and womens' swimming programs for 1994-95 season, and
the respondent State University of New York at Albany will
provide full support of reinstated programs as to competitive and
practice schedules, previously approved 1994-95 budgets,
transportation, facilities, awards, tournament participation
(including pre- and post-season, at home and away), and all other
benefits commonly incident and necessary for the full functioning
of said programs as if they had not been discontinued and
including, but not limited, to:

    (a)  Coaches and assistants will be continued through
the 1994-95 academic year under the terms and
conditions in effect on May 30, 1994; including any
outstanding notices of nonrenewal.

(b)  providing the varsity team activities priority on
use of the facilities - pool, courts, and wrestling
room, over any other uses or users.

and

WHEREAS, the respondent State University of New York at

Albany shall mitigate the impact of any future decision to

terminate programs or reduce them to less-than-varsity status,

by:

(a)  giving prompt notice of the decision to all
potentially affected parties, including, but not
limited, to coaches, current athletes, the student body
generally, the University Undergraduate Admissions
Office, and other colleges and universities contacting
DPEAR regarding transfer admissions for athletes, and

(b)  All changes in program shall be in compliance with
federal law and made in accordance with appropriate
University procedures.

(c)  In the event any such programs are to be
terminated, respondents shall provide appropriate
notice of such termination so as to give any
participant or recruit the opportunity to transfer to
another athletic program at another college or
university without loss of opportunity in successive
years.

IT IS HEREBY STIPULATED AND AGREED by and between the

undersigned attorneys for the respective parties in the within

proceeding, that the same be and hereby is moot and is

discontinued without costs to either party as against the other,

except, without prejudice to an application by petitioners to the

court for an award of attorneys fees, and it is further,

STIPULATED AND AGREED, that the parties agree that no

provision of this stipulation shall be interpreted to be an

acknowledgement of the validity of any of the allegations or

claims that have been made in this proceeding action or an

admission by the respondents of any wrongdoing.

2

undersigned attorneys for the

Dated: August 16, 1994      G. OLIVER KOPPELL
Attorney General of the
State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224

BY: _____
LAWRENCE L. DOOLITTLE
Assistant Attorney General
of Counsel

Dated: August 26, 1994

_____
PAUL H. WEIN
Wein, Young, Fenton
& Sorenon, P. C.
3400 Western Avenue
Albany, New York 12084

SO ORDERED

_____
LAWRENCE E. KAHN J.S.C.

3

TOTAL P.04

3400 Western Avenue