**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
——————————————————————

**DANIELLE DUGUID, et al.,**

           **Plaintiffs,**

     **v.**                  **No. 1:17-cv-1092**

                                    **(TJM/DJS)**

**STATE UNIVERSITY OF NEW YORK at**
**ALBANY, and MARK BENSON,**

           **Defendants.**
——————————————————————

**THOMAS J. McAVOY,**
**Senior United States District Judge**


**DECISION & ORDER**

Before the Court are the parties' motions for summary judgment and the Plaintiffs' motion for class certification. <u>See</u> dkt. #s 125, 126, 124. The parties have briefed the issues, and the Court has determined to decide the matter without oral argument.

**I.**    **Background**

This case originated in claims by former members of the women's tennis team at the State University of New York at Albany ("SUNY-Albany") that the University violated their rights under Title IX of the Education Amendments of 1972 ("Title IX") when the University cancelled the women's tennis program in the spring of 2016. Plaintiff Gordon Graham, who coached the team, joined the suit, adding claims that the University discriminated against him because of his sex and violated his right to equal protection when the University fired

1

him because of his age.  All of the former tennis players have either graduated or left the University, and they have now been replaced by other plaintiffs, who contend that the University violated Title IX by failing to provide women with opportunities to participate in intercollegiate athletics in numbers proportionate to their representation in the student body. They seek injunctive relief to address this situation.  Gordon Graham's employment discrimination claims remain in the case.

Defendants assert that they decided to discontinue women's tennis at SUNY-Albany "based on a lack of Division 1 competition opportunities."  Defendants' Statement of Material Facts Pursuant to Local Rule 7.1(a)(3) ("Defendants' Statement"), dkt. # 126-30, at ¶ 1.[1]  SUNY-Albany had participated in the America East Conference ("AEC") since the University began competing in division one, but several members of the conference had eliminated women's tennis, and after 2015 the AEC no longer had the number of teams necessary for automatic qualification to the NCAA tournament.  Id. at ¶¶ 2-5.  The conference therefore stopped sponsoring women's tennis.  Id. at ¶ 6.  Defendants claim that the University's athletic administration "spent the latter part of the fall 2015 semester identifying and evaluating options that would allow the department to sustain a Division 1 women's tennis program" which "afforded the team an opportunity to participate in the NCAA national tournament."  Id.  The University could find no such opportunity; other conferences in the eastern United States could not accommodate SUNY-Albany, and competing in conferences in other parts of the country would cost too much and cause too

---

[1]Each party filed the statements of uncontested material facts with citations to the record required by the local rules.  The Court will cite to the Defendants' statement for facts which the parties agree are uncontested and will otherwise note where the parties disagree.

much missed class for athletes.  Id. at ¶ 8.  Moreover, competing as an independent would not provide the team or individual athletes a realistic opportunity to compete in the national tournament.  Id. at ¶ 9.

Plaintiffs contend that the University decided to eliminate the women's tennis team because: (a) of the sex of the players; (b) of the national origins of the players, most of whom came from foreign countries; (c) as part of SUNY-Ablany's established practice of favoring men's over women's intercollegiate athletics; (d) as a way to save money; and (e) "the expectation that the tennis team's 65-year-old head coach would retire."  Plaintiffs' Response to Defendants' Statement of Material Facts ("Plaintiffs' Response"), dkt. # 131-1, at ¶ 1(a).  Plaintiffs also contend that the University did not make serious efforts to explore ways to provide competitive opportunities for women's tennis players outside of the America East Conference, where the team had participated.  Id. at ¶ 1(b).  Plaintiffs also contend that Defendants' attempt to find "alternatives that would allow the women's tennis team to establish opportunities for Division I national tournament participation" were not substantial, and that Defendants prevented Coach Graham–who had extensive connections in the world of college tennis and who set much of the team's competition schedule each year–from learning of the team's precarious situation or using his connections to help arrange competition.  Id. at ¶¶ 6; 8(b).  Plaintiffs also contend that another women's tennis team in the EAC found a new conference home "by agreeing to transfer its football team's participation to the conference as well."  Id. at ¶ 7(b).

Defendants claim that the University's decision to disband the women's tennis team allowed "the department to re-invest and strengthen the positioning of the other sponsored women's sports programs."  Defendants' Statement at ¶ 11.  Other programs, SUNY-Albany

3

concluded, would be able to add to their "operational budges, elevate part-time coaching positions to full-time and increase head and assistant coaches' salaries to become more alligned with their experience, success, and market value." Id. Plaintiffs' agree that the University eliminated women's tennis out of a "desire to use its operating funds to bolster other budgetarily constrained women's varisity programs[.]" Plaintiffs' Response at ¶ 11. The University honored the scholarships of the women who had been members of the tennis team and offered them support if they sought to transfer to another school. Defendants' Statement at ¶ 12. Plaintiffs dispute that this conduct, which occurred after the University disbanded the tennis team, amounted to conduct that "'fulfilled' [the University's] commitments'" to the players. Plaintiffs' Response at ¶ 12.

Gordon Graham continued to be employed at SUNY-Albany until his contract expired in August 2017. Defendants' Statement at ¶ 13. Defendants claim that they honored Graham's employment contract. Id. at ¶ 14. Plaintiffs deny this claim, contending that Defendants "employed . . . Graham to work as the head coach of the women's varsity tennis team," which the Defendants "wrongfully terminated." Plaintiffs' Response at ¶ 14. Once they terminated the team, Plaintiffs claim, Defnedants "substantially reduced" Plaintiff's "duties and responsibilities and threatened him with even more menial and debasing jobs if he complained." Id. at ¶ 14(a). The parties agree that Graham did not apply for another position at SUNY-Albany after the university eliminated the women's tennis program. Defendants' Statement at ¶ 15; Plaintiffs' Response at ¶ 15. Plaintiffs add, however, that Graham applied for other college, university, and high school tennis coaching positions. Id. at ¶ 15(a). He was not hired. Id.

SUNY-Albany entered into a Resolution Agreement with the Office of Civil Rights

4

("OCR") in the United States Department of Education in August 2017. Defendants' Statement at ¶ 16. OCR enforces Title IX for the Department of Education. Id. Plaintiffs add that OCR investigated SUNY-Albany's varsity intercollegiate sports programs and concluded "'that the University failed to establish that it had effectively accommodated the athletic interests and abilities of women, the underrepresented sex, as required by the regulation[s] implementing Title IX, at 34 C.F.R. § 106.41(e)(1)." Plaintiffs' Response at ¶ 16(a). SUNY-Albany did not admit to any Title IX violations in signing the Resolution Agreement. Defendants' Statement at ¶ 17.

The parties disagree in their interpretation of the Resolution Agreement. According to the Defendants, the Agreement establishes that OCR will monitor SUNY-Albany through "at least" the 2020-2021 academic year. Id. at ¶ 18. Further, Defendants claim, the Agreement mandates that the University provided OCR detailed annual reports. Id. at ¶ 19. According to the Defendants, SUNY-Albany can demonstrate compliance with Title IX's requirements for providing opportunities to women in intercollegiate athletics in any one of the three ways permitted by the regulations. Id. at ¶ 20. The Agreement does not require SUNY-Albany to create a tennis team or any other team for women. Id. at ¶ 21. According to the Defendants, "[t]he Resolution Agreement includes rigorous oversight and enforcement mechanisms." Id. at ¶ 22. The Agreement contains the following provision:

> The University understands that OCR will not close the monitoring of this Agreement until OCR determines that the University has fulfilled the terms of this Agreement and is in compliance with the regulation implementing Title IX . . . which were at issue in this case. The University also understands that by signing this Agreement, it agrees to provide data and other information in a timely manner in accordance with the reporting requirements of this agreement. Further, the University understands that during the monitoring of this Agreement, OCR may visit the University, interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether the University has fulfilled the terms of this Agreement and is in

5

compliance with the regulation implementing Title IX[.]

Id. at ¶ 23 (quoting Resolution Agreement at 7-8).  Defendants contend that the Agreement permits OCR to "question or challenge any action by SUNY Albany that may interfere with its[2] ability to satisfy the terms of the Resolution Agreement."  Id. at ¶ 24.  The Defendants claim that, should the University fail to "satisfy" the requirements of the Agrement by the end of the Agreement's term, "OCR has the ability to extend the period for which it monitors SUNY Albany and ultimately seek to take away its federal funding received via the U.S. Department of Education, including federal student loans."  Id. at ¶ 25.

Plaintiffs disagree that the Agreement provides for "monitoring" of the University by OCR.  Plaintiffs' Response at ¶ 18.  Plaintiffs claim that the Agreement fails to "state that [OCR] will actively or otherwise monitor SUNY Albany's activities.  Id. at ¶ 18(a).  The Agreement states only, Plaintiffs insists, that "'[t]he University understands that OCR will not close the monitoring of *this Agreement* until OCR determines that the University has fulfilled the terms of this Agreement and is in compliance with the regulation[s] implementing Title IX, at 34 C.F.R. §§ 106.41(a) and(c)(1), which were at issue in this case.'"  Id. (quoting Resolution Agreement at 7). Plaintiffs also point out that no evidence exists that any of the University's "communications to OCR since the Resolution Agreement was signed have been acknowledged by the agency."  Id.  Moreover, no evidence demonstrates that OCR has acknowledged or approved SUNY-Albany's policies for adding a sport.  Id.  Such

---

[2]From context, the Court assumes that Defendants here intend "its" to refer to the University's "ability to satisfy the terms of the Resolution Agreement."  While both the University and OCR could technically "satisfy" the Agreement's terms, the Court assumes that Defendants intend to convey that OCR is interested in actions the University takes to meet the University's obligations under the agreement.

policies, Plaintiffs claim, do not appear on the University's website or student handbooks. Id. Plaintiffs use this evidence to dispute Defendants' claim that the Agreement contains "rigorous oversight and enforcement mechanisms." Id. at ¶ 22. Plaintiffs also allege that Defendants do not claim in their motion for summary judgment or in any other pleading that OCR has ended monitoring of the Resolution Agreement. Id. at ¶ 23(a). Plaintiffs agree that OCR could take enforcement action under the Agreement, but point out that no evidence indicates that OCR has done so. Id. at ¶ 25.

Gordon Graham was sixty years old when SUNY-Albany hired him. Defendants' Statement at ¶ 56. Defendants contend that the University hired Graham on a term contract, which did not create any legal right, expectancy or interest in renewal. Id. at ¶ 57. While Plaintiffs do not deny that the contract was for a limited term, they also contend that the contract "created the expectation that [Graham] would not be discriminated against in any form including gender and age." Plaintiffs Response at ¶ 56.[3] Defendants claim that SUNY had no obligation to offer Graham a new contract when the old one expired. Defendants' Statement at ¶ 58. While Plaintiffs do not deny that Defendants were not required to offer Graham a new contract, they contend that "SUNY Albany was not permitted to terminate Plaintiff Graham's contract for an improper reason and thereby create a question whether it would have the obligation to offer him a new one." Plaintiffs' Response at ¶ 57. Plaintiffs respond in the same way to Defendants' claim that the University "was not required to keep Plaintiff Graham on the payroll indefinitely after the"

---

[3]The numbering in this portion of Plaintiffs' Response is off. The Response recites the statement the Response addresses, however. The Court is able to evaluate the statements despite this error. The Court provides the paragraph numbers as used in the documents.

University "discontinued" women's tennis. Plaintiffs' Response at ¶ 58; Defendants' Statement at ¶ 59. Defendants further contend that, had Graham wanted to find another position with the University, he would have been required to comply with SUNY-Albany and State of New York hiring procedures. Defendants' Statement at ¶ 60. Plaintiffs point to evidence that other coaches who left their jobs in one sport had been hired as assistants in another sport without going through that broader hiring process. Plaintiffs' Response at ¶ 59(a).

The parties disagree over whether Graham found comments made by University's Athletic Director, Defendant Mark Benson, during a meeting concerning termination of the women's tennis program, to be "threatening." Compare Defendants' Statement at ¶ 61 and Plaintiffs' Response at ¶ 60. They offer different interpretations of Graham's testimony concerning statements by Benson during that meeting that Graham was likely old enough to retire. See Deposition of Gordon Graham, Exh. 1 to Defendant's Statement of Material Facts, dkt. # 126-2, at 120-125. They also disagree over whether Benson was "sympathetic" towards Graham's situation at that time. Compare Defendants' Statement at ¶ 62; Plaintiffs' Response at ¶ 61. The parties also disagree over whether Benson made statements "disparaging" Graham's age group at that meeting, and whether Benson expressed any "animus, hatred, dislike, or negative feelings towards Plaintiff Graham." Compare Defendants' Statement at ¶ 64-65; Plaintiffs' Response at ¶ 63-64. Plaintiffs deny Defendant Benson's claim that he "mentioned retirement as merely one of several possible options for Plaintiff Graham, and expressed a willingness to consider Plaintiff Graham for another position in the Department." Defendants' Statement at ¶ 66; Plaintiffs' Response at ¶ 65.

8

Gordon Graham advised SUNY-Albany during his interview for the tennis coach job that he had retired from his previous position as Harvard University tennis coach. Defendants' Statement at ¶ 67.  Graham had made similar statements to the media, telling the Troy record that he had "'come out of retirement'" to lead the Albany women's tennis team and "rebuild" the "program" in 2011.  Id. at ¶ 68.  Graham made more money "in some years" after leaving SUNY-Albany than he did in his last year at the University.  Id. at ¶ 69. He has not received any medical care, mental health treatment, or therapy for any condition the Defendant' caused.  Id. at ¶ 70.  Graham continues his involvement in tennis through a Massachusetts tennis camp he operates.  Id. at ¶ 71.  That camp provides lessons to juniors and adults.  Id.

## II.   Legal Standard

The parties seek summary judgment.  It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party

opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

## III.   Analysis

Both parties seek summary judgment. The Court will first address Defendants' motion, since granting that motion would dispose of all of the issues raised in Plaintiffs' motion as well.

### A.   Title IX

Defendants first seek summary judgment on Plaintiffs' Title IX claims. Defendants do not address whether evidence exists that could reasonably demonstrate that SUNY-Albany violated Title IX by failing to provide sufficient intercollegiate athletic opportunities to women. Instead, they argue that the Resolution Agreement vitiates any need for this Court to provide the injunctive relief the Plaintiffs seek. They also assert that Plaintiffs, who have not disclosed any expert testimony, cannot prove their claims without such evidence. Defendants further contend that the student-Plaintiffs now in the case–women who seek to have the opportunity to participate on an intercollegiate rowing team–lack standing to sue because they have no legitimate expectation of membership on any team established. The Court will address Defendants' arguments in turn, as appropriate.

i.    **Availability of Relief**

"Title IX provides, in relevant part, that '[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'" Biedinger v. Quinnipiac Univ., 691 F.3d 85, 92 (2d Cir. 2012) (quoting 20 U.S.C. § 1681(a)).  While the statute does not mention athletics, federal agencies "have interpreted Title IX to require recipients of federal financial assistance operating or sponsoring 'interscholastic, intercollegiate, club or intramural athletics' to 'provide equal athletic opportunity to members of both sexes.'" Id. (quoting 34 C.F.R. § 106.41(c)).

Title IX regulations "'[require] institutions to accommodate effectively the interests and abilities of students to the extent necessary to provide equal opportunity in the selection of sports and levels of competition available to members of both sexes.'" McCormick v. Sch. Dist. of Mamroneck, 470 F.3d 275, 300 (2d Cir. 2004) (quoting Policy Interpretation, 44 Fed. Reg. at 71.417).  Whether an institution complies with the equal opportunity requirement can "be assessed in any one of" three ways:

> (1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments, or
> (2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or
> (3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

Id. (quoting Policy Interpretation, 44 Fed. Reg. at 71.418).  Courts use this test "to assess

whether an institution is providing nondiscriminatory *participation opportunities* to individuals of both sexes, and an institution is in compliance if it meets any one of the three" parts "of the test." Id. (citing Office for Civil Rights, U.S. Department of Education, CLARIFICATION OF INTERCOLLEGIATE ATHLETICS POLICY GUIDANCE: THE THREE-PART TEST (Jan. 16, 1996) (emphasis in original)). The Department "affords schools considerable 'flexibility and choice' in deciding how to provide substantially proportionate athletic opportunities to students of both sexes, including by eliminating teams, placing caps on its rosters . . . or 'expanding . . . athletic opportunities through new sports.'" Biediger, 691 F.3d at 94 (quoting Letter from Stephanie Monroe, Assistant Sec'y for Civil Rights, Office of Civil Rights, United States Department of Education, to Colleagues, Sept. 17, 2008, at 4).

In this case, Plaintiffs filed their initial Complaint on September 29, 2017. See dkt. # 1. In their Complaint, Plaintiffs acknowledged that Gordon Graham had filed a complaint with the OCR that "resulted in a toothless negotiated agreement between the Department of Education and SUNY Albany ('Resolution Agreement.')." Id. at ¶ 4. Whatever their characterization of the Resolution Agreement, Plaintiffs acknowledge they instituted their cause of action after OCR reached an agreement designed to rectify the violations identified in Graham's OCR complaint. As relief in the Second Amended Complaint, dkt. # 95, Plaintiffs seek, in relevant part, for the Court to:

> (2) Issue permanent injunctions requiring Defendant SUNY Albany to stop discriminating against women in the operation of its intercollegiate athletics programs, to report participation statistics relevant to Title IX compliance fully and accurately, and to come into full and complete compliance with Title IX in the operation of its intercollegiate athletics programs within one year, beginning with the immediate addition of new women's varsity sports teams having an aggregate of one hundred aggregate roster spots for which sports there is current demonstrated interest among either existing SUNY Albany female students or participation in high school programs in New York State;

(3) Issue permanent injunctions requiring Defendant SUNY Albany not to eliminate or reduce the status of any women's varsity athletic team or opportunity until such time as the Court shall find that Defendant SUNY Albany is in full compliance with Title IX and that such elimination or reduction in the status of a women's team would not violate Title IX.

. . .

(5) Maintain jurisdiction over this action and assign a Special Master to monitor Defendant SUNY Albany's full and timely compliance with the Court's orders.

Id. at Prayer for Relief.

Defendants argue that the Court should defer to the negotiated Resolution Agreement and decline to provide any injunctive relief that would interfere with the operation of that Agreement. Plaintiffs respond that Title IX contains an implied private right of action to enforce the rights guaranteed under the law, and that "[t]he idea that they could be dispossessed of that right, or have it delayed indefinitely, by the mere existence of an 'agreement' to which the affected individuals were not even parties," would undermine that right of action.

This case represents a rather unique situation. The original Plaintiffs were women who played on the SUNY-Albany women's tennis team when the University announced cancellation of the program in Spring 2016. They did not file their Complaint until September 29, 2017, however. On November 8, 2017, Plaintiffs sought a preliminary injunction that reinstated the tennis team. See dkt. # 11. The Court determined that Plaintiffs had sat on their rights for too long, and that a preliminary injunction was not available under the circumstances. See dkt. # 28. Plaintiffs had not demonstrated irreparable harm. Id. at 11-13. Plaintiffs also filed a contemporaneous state-court action that sought similar relief and delayed the Court's ability to address the matter. See id. at 6-10. In that period of delay, Plaintiff Graham filed a complaint with OCR, OCR investigated,

and the University and the Department of Education signed a Resolution Agreement meant to address the imbalance of opportunities for men and women in intercollegiate athletics at the University.

Plaintiffs now ask the Court to order SUNY-Albany to take action to establish opportunities for women, to report on those efforts, and to end discrimination against women in athletics all of which the Resolution Agreement described above covers. Plaintiffs also ask the Court to enjoin the University from eliminating any women's sports and to appoint a special master to supervise SUNY-Albany's compliance with the Court's directives. A special master the Court appointed at Plaintiffs' request would serve much the same role as that of the OCR under the Resolution Agreement. Establishing such procedures would likely duplicate, or even undermine, the efforts of the OCR and the provisions of the Resolution Agreement.

Title IX does not contain an explicit private right of action. In Cannon v. University of Chicago, 441 U.S. 677 (1979), however, the Supreme Court found an implied private right of action in that legislation. Id. at 717. The Court has also concluded that money damages are available under the statute, in addition to equitable relief. Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 76 (1992).

In Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274 (1998), the Supreme Court considered whether a school district could be held liable for sexual harassment of a student by a teacher under Title IX. Id. at 277. The Court concluded that liability could attach only when "an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct." Id. The Court considered this question in part in the context of the

14

implied liability that exists under Title IX, noting that "the private right of action" in the statute "is judicially implied . . . and there is no legislative expression of the scope of available remedies, including when it is appropriate to award monetary damages." Id. at 284. Under those circumstances, the Court found, "we have a measure of latitude to shape a sensible remedial scheme that best comports with the statute." Id. In that understanding, "we generally examine the relevant statute to ensure that we do not fashion the parameters of an implied right in a manner at odds with the statutory structure and purpose." Id. Such "considerations," the Court found, "are pertinent not only to the scope of the implied right, but also to the scope of the available remedies." Id. In light of those principles, the Court found that "it would 'frustrate the purposes' of Title IX to permit a damages recovery against a school district for a teacher's sexual harassment of a student based on principles of *respondeat superior* or constructive notice, *i.e.*, without actual notice to a school district official." Id. at 285. The Court noted that Title IX, which denies funding to recipients who discriminate on the basis of sex, operated on contractual principles, required federal agencies to notify recipients of funds of violations before denying that funding, and encouraged remedial action as a condition of continued funding. Id. Under those circumstances, "[i]t would be unsound . . . for a statute's *express* system of enforcement to require notice to the recipient and an opportunity to come into voluntary compliance while a judicially *implied* system of enforcement permits substantial liability without regard to the recipient's knowledge or its corrective actions upon receiving notice." Id. at 289 (emphasis in original).

While this case is different, since the Plaintiffs do not seek monetary damages from the University, the principles underlying Gebser are instructive for the question of whether a

15

Court can enjoin a university in a way that interferes with a Resolution Agreement in place before the Plaintiffs took action. The Eighth Circuit Court of Appeals in Grandson v. Univ. of Minn., 272 F.3d 568 (8th Cir. 2001),[4] addressed the interplay between a resolution agreement that addressed Title IX discrimination in athletics at a university and claims brought pursuant to the implied private right of action in that statute. Recognizing that the Eight Circuit's conclusions were not part of the court's holding and that such findings would not be binding on this Court anyway, the Court nonetheless finds them instructive for this situation.

In Grandson, female plaintiffs sued the University of Minnesota in two separate actions, alleging that administrators had violated Title IX in their treatment of female athletes. In one action, a student sought "injunctive relief and compensatory damages for the scholarship and financial support she allegedly would have received as a members of the women's varsity soccer team" at the University of Minnesota-Duluth ("UMD") had the University not discriminated against women by eliminating the team. 272 F.3d at 572. In the other action, three women "purported to sue on behalf of a class of similarly situated female students." Id. These plaintiffs "sought injunctive relief requiring UMD to end gender discrimination in its intercollegiate athletic program by increasing the total number of participation opportunities for women and by adding an NCAA Division I women's team." Id. Before plaintiffs filed either case, OCR "notified UMD that a Title IX complaint had been filed alleging UMD and its athletic department were violating Title IX" in a number of ways,

---

[4]Neither party has pointed the Court to Second Circuit case that addresses this issue. The Court has found none, and has not found any case in any Circuit that offers a holding on the issue of whether a Resolution Agreement precludes or moots a private action for injunctive relief under Title IX.

including "not effectively accommodating the athletic interests and abilities of females[,]"  Id.

OCR and UMD "entered into an Agreement to resolve the September 1996 complaint" in

April 1997.  Id.  That Agreement "required UMD to increase the squad size of its varsity

teams for women, to provide women 'equivalent opportunities to receive athletic financial

assistance,' and to provide women equivalent access to the other services and facilities

enumerated in the complaint."  Id.  The Agreement also required UMD to submit status

reports over a period of four years.  Id.  "In November 2000, after UMD submitted these

reports, OCR determined that UMD had fully implemented all provisions of the Agreement"

and "terminated its administrative monitoring."  Id.

The district court dismissed the class allegations as untimely filed and granted

Defendants summary judgment.  Id. at 573.  The Court found that "the four plaintiffs lacked

standing to seek injunctive relief because they had not played a varsity sport or had

exhausted their NCAA eligibility."  Id.  The Court of Appeals noted that while "plaintiffs do

not disclose the specific relief they seek, it is apparent they envision injunctive relief that

would have the district court function as a *de facto* super-athletic department director[.]"  Id.

The Circuit Court noted that a number of Title IX cases had challenged sex discrimination in

college sports, but stated that:

> to our knowledge this is the first case in which (i) a class was brought after the
> relevant federal funding agency lodged a broad overlapping complaint against the
> university, (ii) plaintiffs seek class-wide injunctive relief over and above a university
> compliance program that the revlevant funding agency has found to be fully
> adequate, and (iii) plaintiffs seek class-wide damages for alleged programmatic
> deficiencies that were voluntarily remedied when brought to the university's attention
> by the funding agency's complaint.  Mindful of the Supreme Court's admonition that
> we must "shape a sensible remedial scheme that best comports with the statute," we
> doubt that such sweeping claims would ever be sustained in these circumstances.

Id.  The Court did not rule on the issue of whether plaintiffs could bring such claims,

17

however, since "the most sweeping claims need not be addressed if the district court was correct in striking [the] class allegations and in denying the individual plaintiffs standing to seek injunctive relief." Id. at 573-74. In the end, the Court found that the district court had not erred in dismissing the action on that more limited basis, and offered no holding on the availability of injunctive relief or damages to plaintiffs who sue a university that has entered into an agreement to resolve a Title IX complaint. Id. a 574-76. The Court affirmed the judgment of the district court. Id. at 576.

A footnote to the Court's decision is instructive for the case here. As part of the Circuit Court's discussion of the suitability of relief for plaintiffs when a university and the OCR have negotiated a resolution agreement, the Court compared the situation to one under another statute:

> In the Clean Water Act, Congress provided for administrative remedies and expressly authorized private citizen suits that supplement but do not supplant agency enforcement. See 33 U.S.C. §§ 1319(g), 1365(b). We construed these remedial provisions to mean that an informal administrative enforcement agreement precludes a citizen suit for inconsistent civil penalties. Comfort Lake Ass'n v. Dresel Contracting, Inc, 138 F.3d 351, 356-57 (8th Cir. 1998). We read Gebser as requiring that an implied private action for system Title IX relief must likewise take a back seat to an agency proceeding that has led to satisfactory voluntary compliance.

Id. at 573 n.6.[5] The Eighth Circuit therefore implied that a private action seeking to alter or

---

[5]Comfort Lake cites to two Second Circuit cases in discussing whether "voluntary compliance" can moot a citizen suit under the Clean Water Act. 138 F.3d 351 at 356. In Atlantic States Legal Found., Inc. v. Eastman Kodak Co., 933 F.2d 124 (2d Cir. 1991), the Second Circuit addressed "whether a properly commenced citizen suit under the Clean Water Act may continue after the citizen suit defendant and the appropriate state officials have reached a settlement regarding the Clean Water Act violations at issue." Id. at 125. The court found that the citizen suit could not continue "unless there is a realistic prospect that the violations alleged in" the citizen suit "will continue notwithstanding the settlement." Id. at 127. Atlantic States Legal Found v. Pan Am. Tanning Corp., 993 F.2d 1017 (2d Cir. 1993), permitted a lawsuit to continue when plaintiff sought damages and defendant's

(continued...)

enforce the terms of an agreement between OCR and a University designed to rectify a Title IX violation would be an unwarranted interference in the Department of Education's administrative authority.

Plaintiffs' motion for summary judgment relies in part on the OCR's investigation to argue that Defendants have violated Title IX. Plaintiffs provide a letter from Timothy C.J. Blanchard, Director of the OCR in New York, to Gordon Graham, dated August 9, 2017. See dkt. # 125-2. The letter notifies Graham of the results of the OCR's investigation of his Title IX complaint, which "alleged that the University discriminates against female students, on the basis of sex, by failing to fully and effectively accommodate the interests and abilities of female students to the extent necessary to provide equal athletic opportunities to members of both sexes." Id. at 1. Blanchard explained that OCR applied the three-part test above to see whether the University was in violation of Title IX. Id. at 2-3. OCR's investigation "collected and analyzed data for academic years 2014-2015, 2015-2016 and 2016-2017, conducted interviews of" Graham, "third parties, and the Athletic Director; and made compliance determinations with respect to the accommodation of athletic interests

---

[5](...continued)
settlement with an agency "did not cover all the violations plaintiffs allege and assessed small fines[.]" 993 F.3d at 1022. These cases address the Clean Water Act, where the private right of action is express, not implied as in Title IX. They do, however, address an issue that this case raises: can private citizens interfere with an agreement between an agency and a party that agency regulates when the private party has an interest in the outcome of the regulation? In Eastman Kodak, the court concluded that "a citizen suit cannot proceed solely for the purpose of challenging the terms of a settlement reached by state officials so long as the settlement reasonably assures that the violations alleged in the citizen suit have ceased and will not recur." 933 F.2d at 125. Without decisions on Title IX with holdings directly on this issue, the Court is persuaded that the implied right of action in Title IX does not permit suits filed after a settlement between OCR and a university that attempt to alter or enforce the terms of a settlement that remains in place.

and abilities." Id. at 3.  OCR examined participation by men and women on university sports teams and found that female athletes were underrepresented in each of the years studied. Id. at 4-5.  SUNY-Albany thus failed part one of the three-part test.  Id. at 5.  OCR noted that the University had not added a women's team since 1997 and had eliminated a women's team at the end of the 2015-2016 season.  Id. at 6.  Thus, OCR concluded that "the University has not demonstrated a record of adding intercollegiate teams, or upgrading teams to intercollegiate status, for the underrepresented sex." Id.  In addition, OCR found that the University did not have a policy or procedure for adding sports.  Id. at 8.  OCR therefore could not find "that the University has established compliance under Part Two of the Three-Part Test."  Id.  OCR also found that the University had not made efforts to accommodate the interests of and abilities of students, citing in particular the elimination of the women's tennis team.  Id. at 10.  SUNY-Albany thus failed the third part of the test.  Id.

In the end, Blanchard reported, "OCR determined that the University failed to establish that it has effectively accommodated the athletic interest and abilities of women, the underrepresented sex, as required by the regulation implementing Title IX[.]" Id. at 12. He explained to Graham that OCR and SUNY-Albany had entered into the Resolution Agreement, and enclosed a copy.  Id.  Blanchard informed Graham that "OCR will monitor implementation of the Agreement."  Id.  If SUNY-Albany did not "implement the Agreement, OCR may initiate administrative enforcement or judicial proceedings to enforce the specific terms and obligations of the Agreement."  Id.

Plaintiffs point to evidence that "[b]ased on its self-reported data including data it recently supplied to Plaintiffs in discovery, through school year 2019-2020, Defendant SUNY Albany continues to provide numbers of varsity intercollegiate opportunities for

20

female students that are inferior in their representation in the undergraduate student population[.]"  Plaintiffs' Brief in Support of their Motion for Summary Judgment, dkt. # 125-1, Statement of Material Facts contained within that Brief, at ¶ 21.  Such disparities are "larger than the average squad sizes for Defendant SUNY Albany's women's sport teams," Plaintiffs claim.  Id.[6]

Plaintiffs in this case seek injunctive relief to compel the University to comply with Title IX.  That relief would be independent of the Resolution Agreement between OCR and the University, which is already aimed at obtaining compliance with Title IX.  No party here contends that the University has fully complied with the Agreement.  Indeed, the University contends that conditions caused by the COVID-19 pandemic have devastated the University's budget and undermined efforts to achieve equality of opportunity in athletics on campus.  See Defendants' Statement at ¶¶ 32-46.  Neither party contends, however, that OCR has decided to stop monitoring the University or determined that the further action permitted by the agreement is unnecessary.  The process envisioned by the Agreement continues.

The Court finds that, under the unique circumstances of the this case, Plaintiffs cannot obtain the injunctive relief they seek.  First, even if the Court concluded that an injunction was necessary, the Court could not provide all of the relief that Plaintiffs seek.  Courts have concluded that Title IX does not permit a court to require particular positive

---

[6]While such disparities would likely fail part one of the three-part test, that evidence does not prove that SUNY-Albany remains in violation of Title IX.  As explained above, a university need satisfy only one of the three parts of the test to satisfy Title IX.  Plaintiffs would not be entitled to summary judgment on this evidence, and the Court would deny their motion in that respect.

actions to satisfy the statute's requirements.  See, e.g., McCormick, 370 F.3d at 293

(institutions "have considerable flexibility in complying with Title IX.").   Thus, ordering the

University to comply with Plaintiffs' demand that the institution establish more teams for

women, when the University might comply with Title IX by eliminating men's positions,

would not satisfy the law.  More important, providing injunctive relief under these

circumstances would undermine the OCR's enforcement powers, interfere with an

agreement between a federal agency and an institution partly supported by federal grants,

and disrupt a process contemplated by the regulations implementing Title IX.  While the

Court recognizes that the Defendants may still be in violation of Title IX,[7] the Court also

notes that the Defendants are still also subject to the loss of funding or federal court action

that the Resolution Agreement contemplates.  The Court concludes that injunctive relief

should not be awarded while that possibility remains. In the end, the Court finds that

Plaintiffs effectively attempt to monitor, implement, and alter the Resolution Agreement by

seeking injunctive relief.  That is an equitable power that the Court concludes is unavailable,

and one that the Court would in its discretion decline to exercise were such power extant.

The Court will therefore grant the Defendants' motion for summary judgment with

respect to Plaintiffs' request for injunctive relief pursuant to Title IX.  The Court recognizes

that such a conclusion is hardly satisfying to the women's tennis players who were the

original Plaintiffs in the suit or to the young women who now seek an opportunity to row on

an intercollegiate level.  The Court concludes, however, that the law requires such an

outcome.  The Court offers no opinion about whether future plaintiffs could prevail on a Title

---

[7]As explained, no conclusive proof on that subject is before the Court.

IX claim raised at some later date.

As the Court has determined that Defendants are entitled to summary judgment on Plaintiffs' Title IX claim, the Court will deny the Plaintiffs' summary judgment motion, which seeks summary judgment on that same claim. Because no Title IX claim remains, the Court will also deny the motion to certify a class action on Count I of the Second Amendment Complaint. Since the Court has dismissed that Count on a basis independent of the identity of the named plaintiffs, the Court will deny the motion for class certification.

## B.    Plaintiff Graham's Claims

The remainder of the Second Amended Complaint contains claims of employment discrimination brought by Plaintiff Gordon Graham. Defendants seeks summary judgment on those claims as well. The Court will address their arguments in turn, as appropriate.

### i.    Title IX

Defendants seek judgment on Graham's Title IX claim on several bases. First, they argue that no such claim for employment discrimination by an individual employee is available under Title IX. They contend that the law has changed since July, 2018, when the Court determined that such a claim could be brought under the statute. In any case, Defendants claim, no evidence exists to support such a claim. None of the evidence in the case indicates that the University's cancellation of the women's tennis program came as a result of Graham's gender. Defendants also claim that Graham has not demonstrated any damages. Finally, Defendants insist that legitimate, non-discriminatory reasons existed for eliminating the tennis program. Plaintiffs explain that Graham's claim is that "by terminating the women's tennis team on the basis of gender he too, as their coach, suffered

23

discrimination." Plaintiffs also insist that Graham suffered damages, and that the facts around the reasons for termination of the women's tennis team are in dispute.

The Court has already addressed the issue of whether Graham can raise an individual claim of discrimination under Title IX on the basis of the termination of the women's tennis program. The Court concluded that he could, and Defendants have pointed to no binding authority that alters the Court's opinion. The Court will not revisit that issue here. The question for the Court is whether there are disputed issues of fact over whether Graham experienced employment discrimination on the basis of sex. As the Court explained previously, to prevail on such a claim, Graham would need to show: "(1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action;[8] and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." Sassaman v. Gamache, 566 F.3d 307, 312 (2d Cir. 2009). "Proof of discriminatory intent is necessary to state a discriminatory treatment claim[.]" Yusuf v. Vassar College, 35 F.3d 709, 714 (2d Cir. 1994)). If the Plaintiff can make out this prima facie case, then "the burden shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason for the [adverse act]'" Leibowitz v. Cornell Univ., 584 F.3d 487, 498-99 (2d Cir. 2009) (quoting Patterson v. County of Oneida, 375 F.3d 206, 221 (2d Cir. 2004) (additional citation omitted)). When the defendant manages to meet that burden, "'the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by

_____

[8]The Second Circuit Court of Appeals has concluded that "where an employee seeks renewal of an employment contract, non-renewal of an employment contract constitutes an adverse employment action for purposes of Title VII[.]" Leibowitz v. Cornell Univ., 584 F.3d 487, 501 (2d Cir. 2009).

the defendant were not its true reasons, but were pretext for discrimination.'" Id. at 499 (quoting Patterson, 375 F.3d at 221)).  In the end, however, the burden remains with the plaintiff to show discrimination.  Id.

Defendants' argument first addresses the fourth of the elements of a prima facie case: they insist that "there is no evidence supporting the view that SUNY Albany's alleged failure to provide effective accommodation to the women's tennis players amounts to intentional discrimination directed at Plaintiff Graham."  Plaintiff responds that the decision to terminate the women's team cost Graham his job.  Since that decision allegedly took place under circumstances giving rise to an inference of discriminatory intent, Graham was a victim of gender discrimination.  Plaintiffs argue that "the university chose to eliminate the team in order to redistribute funds allocated to the tennis program to other sports.  Said differently, the decision was based on dollars and cents and not driven by a concern over competitive opportunities.  In so doing, Defendants only exacerbated and perpetuated the historical disparity between male and female student athletes at SUNY Albany."

In support of their claim that Defendants acted with discriminatory intent, Plaintiffs point to "Exhibit A to Plaintiffs' Response to Defendants Statement of Material Facts (White disclosure documents)]."[9]  While Plaintiffs are not clear about the documents to which they refer, the documents contained in these exhibits appear to evaluate the University's efforts to address gender equity in the athletic department.  See dkt. # 131-2.  The documents

---

[9]Exhibit A consists of 117 pages.  The Court has examined the entire exhibit, as Plaintiffs' reference does not point to any specific portion of that exhibit.  Exhibit A contains responses to interrogatories propounded by the Plaintiffs.  Among those responses were documents produced through Cara White, an athletics administrator.  Those documents referenced Albany's attempts to address gender disparities in the athletics program in response to the OCR investigation.  See dkt. # 131-2.

contain information about the gender of student athletes and coaches, as well as efforts made to address the gender imbalance in participation identified by the OCR investigation. See id. The documents include records of the Title IX Resolution Committee the University established to implement the Resolution Agreement SUNY-Albany signed with OCR. All of the documents cited by the Defendants post-date the University's decision to terminate the women's tennis team and the University's decision not to renew Graham's contract. Even the statistics on athletic participation by gender in these documents begin with the 2016-2017 season, the season after women's tennis ended. None of this information sheds light on the decision to terminate the women's tennis team at the end of 2015 and the beginning of 2016, and is therefore not relevant to the question of discriminatory intent. While the information may show a gender imbalance after the University terminated women's tennis, that evidence does not create any inference about the University's earlier action. This evidence does not help Graham make out his prima facie case.

Indeed, the Plaintiffs' argument in this respect appears to admit that the reason for the University's decision to eliminate women's tennis rested on budgetary concerns and a decision to direct resources in a different direction, not on the gender of the athletes. Plaintiffs do not argue that the aim of redirecting such resources was to shift them from men to women, or to shift them away from the women's team because of their sex. The result of that decision decreased opportunities for women, but effect is not the same as intent. Moreover, Plaintiffs have not pointed to any evidence that Graham's gender was in any way the target of the decision to eliminate the women's tennis team. The Court must find that Plaintiff Graham has failed to make out a primary case in this respect.

Because Graham has not made out a prima facie case, the Court need not address

whether he has produced evidence to dispute Defendants' claim that they had legitimate non-discriminatory reasons for eliminating the women's tennis team. The Court will grant the Defendants' motion with respect to this count.

### ii. Equal Protection

Defendants argue that the Court must dismiss Plaintiffs' equal protection claim, brought pursuant to 42 U.S.C. § 1983, which alleges that Defendants discriminated against him because of his age. They repeat an argument that Plaintiff must use the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq., to address this alleged discrimination. The Court has already rejected that position, and will rely on those earlier conclusions to deny the motion on that basis. Defendants also offer several reasons why the Defendant cannot maintain a Section 1983 claim of age discrimination. The Court will address them in turn, as appropriate.

"Where the plaintiff does not allege he is a member of a protected class, his Equal Protection claim may only be based on two theories, selective enforcement or "class of one." Chizman v. Scarnati, 218 F.Supp.3d 175, 181 (E.D.N.Y. 2016) (citing Airday v. City of N.Y., 131 F.Supp.3d 174, 184 (S.D.N.Y. 2015)). Since age is not a protected class for the purposes of equal protection under the Fourteenth Amendment and public employees cannot bring a "class of one" equal protection claim, Graham must here rely on a selective enforcement theory. Id.

As a general matter, a selective enforcement equal protection claims requires a showing: "'(1) [that] the person, compared with others similarly situated, was selectively treated; and (2) that the selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise constitutional rights or bad faith

27

intent to injure a person.'" <u>Freedom Holdings, Inc. v. Spitzer</u>, 357 F.3d 205, 234 (2d Cir. 2004) (quoting <u>Lisa's Party City, Inc. v. Town of Henrietta</u>, 185 F.3d 12, 16 (2d Cir. 1999)).[10] A plaintiff who raises this type of selective enforcement claim "must 'prove that the disparate treatment was *caused* by the impermissible motivation.'" <u>Hu v. City of New York</u>, 927 F.3d 81, 91 (2d Cir. 2019) (quoting <u>Bizzarro v. Miranda</u>, 394 F.3d 82, 87 (2d Cir. 2005) (emphasis in original)). To show that he was "similarly situated" to another person treated differently, "'the plaintiff's and the comparator's circumstances must bear a reasonably close resemblance.'" <u>Id.</u> at 96 (quoting <u>Brown v. Daikin Am. Inc.</u>, 756 F.3d 219, 230 (2d Cir. 2014)). Such circumstances "need not, however, be 'identical.'" <u>Id.</u> (quoting <u>Brown</u>, 756 F.3d at 230). "A plaintiff can prevail by showing that "'[he] was similarly situated in all material respects to the individuals with whom [he] seeks to compare [him]self." <u>Id.</u> (quoting <u>Graham v. Long Island Rail Road</u>, 230 F.3d 34, 39 (2d Cir. 2000)).

Plaintiffs do not address the particular elements of a selective enforcement claim. Instead, they argue that evidence exists to support a claim that University discriminated against him because of his age. Their briefing offers no argument about how Plaintiffs' treatment was different from others similarly situated. Plaintiffs do point to some evidence in the record that indicates that the University's Athletic Department "provided at least one female basketball coach who was required to leave her position with the women's basketball team a different job working as an assistant for the football team, without going

_____

[10]Plaintiffs' briefing does not offer a particular legal standard the Court should use to evaluate the equal protection claim. Plaintiff simply notes that the Court previously determined that Graham could raise an age-discrimination claim pursuant to Section 1983, as opposed to the ADEA. Plaintiffs offer no argument that the standard that Defendants propose–a selective enforcement standard–is the proper test to use under these circumstances. They fail to address the legal standard in any detail.

through New York State hiring procedures for new hires[.]" Plaintiffs' Response ta ¶ 59(a).

Plaintiffs here reference the deposition of SUNY-Albany Athletic Director Mark Benson.

See dkt. # 126-5.  Benson responded to a question from Plaintiffs' counsel about whether

he knew "of any coaches who have transitioned into administrative duties at U. Albany?"  Id.

at 50.  Benson responded that "we did have a coach that no longer wanted to coach and did

perform some other duties in our department on a temporary basis."  Id.  That coach, Mary

Grimes, had been coaching women's basketball.  Id. at 51.  Grimes had been "retained . . .

as an assistant" coach when a new head coach took over the women's basketball team, but

Grimes and the new coach "agreed that they wanted to go in different direcdtions[.]"  Id.

According to Benson, when those events occurred "[w]e honored the remainder of her

contract essentially."  Id. at 51-52.  The contract had an "end date . . . [s]imilar to Coach

Graham's[.]"  Id. at 52.  Grimes assumed a new position where she "helped assisting the

football coaches and whatever tasks they needed."  Id.  Benson explained that Grimes "had

duties reassigned to her because she no longer was serving as assistant women's

basketball coach."  Id. at 56.  "Well given the fact that she was no longer serving as

assistant coach," Benson explained, "we had to find duties for her and she wanted to do

these, so that how we worked that out."  Id. at 58.  Grimes left the University once her

contract ended.  Id. at 59.

Plaintiffs reference Grimes, but make no effort to explain how she was similarly

situated to Graham in the sense required to support a selective enforcement claim in this

context.  Graham here argues that the discrimination he faced came because of his age,

but nothing in the record indicates that Grimes was younger than Graham, or offers any

information about her age.  The question here is whether the circumstances faced by

Grimes and Graham "'bear a reasonably close resemblance.'" Hu, 927 F.3d at 96 (quoting Brown, 756 F.3d at 230). Plaintiff must show "'[he] was similarly situated in all material respects to the individuals with whom [he] seeks to compare [him]self." Id. There are similarities between the two: both Graham and Grimes stopped working the jobs to which they had been assigned before their term contracts ended. There are, however, material differences between Graham's situation and Grimes's. First, Graham was the head coach of a team. Grimes was an assistant coach. Second, the reasons for the two coaches losing their jobs were different. In Grimes' case, the head coach team decided Grimes was no longer an appropriate fit for her job, and the two agreed to part ways. Grimes lost her job because of a conflict with the head coach. Graham lost his job because the University decided to eliminate his position altogether. Such a situation creates a different workplace dynamic and a different role for the athletic department in deciding how the former coaches should serve out the remainder of their contract. Moreover, Grimes is not necessarily an example of a similarly situated person being treated differently. While the Court finds that, as a matter of law, the two are not similarly situation, to the extent that the two are similar they received similar treatment. Both had term contracts, and both found themselves without the job to which they were assigned before their terms ended. The Athletic Department then assigned both alternate duties in the department that lasted until their contracts ended.

Plaintiffs have therefore failed to produce any evidence a reasonable juror could use to determine that Defendants treated a similarly situated person differently from Graham, and the Court must grant summary judgment on this claim as well, even without considering whether such treatment was based on impermissible considerations.

30

**IV.    CONCLUSION**

For the reasons stated above, the Defendants' motion for summary judgment, dkt. # 126, is hereby GRANTED.  Plaintiffs' motion for summary judgment, dkt. # 125, is hereby DENIED.  Plaintiffs' motion for class certification, dkt. #124, is hereby DENIED.  The Clerk of Court if directed to CLOSE the case.

**IT IS SO ORDERED.**

Thomas J. McAvoy
Senior, U.S. District Judge

Dated: July 6, 2021